Perry R. Clark
California Bar No. 197101
LAW OFFICES OF PERRY R. CLARK
825 San Antonio Road
Palo Alto, CA 94303
Tel: 650/248-5817
Fax: 650/618-8533
perry@perryclarklaw.com

J. Scott Denko, *pro hac vice*
Texas State Bar No. 00792457
Bradley D. Coburn, *pro hac vice*
Texas State Bar No. 24036377
Steven J. Lauff, *pro hac vice*
Texas State Bar No.24013011
DENKO COBURN LAUFF LLP
1501 S MoPac Expy; Ste. A315
Austin, Texas 78746Tel: 512/906-2074
Fax: 512/906/2075
denko@dcllegal.com
coburn@dcllegal.com
lauff@dclegal.com

Counsel for Plaintiff
**POSITIVE TECHNOLOGIES, INC.**

***ADDITIONAL COUNSEL LISTED ON***
***SIGNATURE PAGE***

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| POSITIVE TECHNOLOGIES, INC., <br><br>        Plaintiff <br><br>     v. <br><br> SONY ELECTRONICS, INC., DELL INC., ASUS COMPUTER INTERNATIONAL, AMAZON.COM, INC., BARNES & NOBLE, INC., AND KOBO INC., <br><br>        Defendants, <br> and <br><br> CHUNGHWA PICTURE TUBES, LTD., <br><br>        Intervenor. | CIVIL ACTION NO. 11-cv-2226 SI <br><br> **PLAINTIFF POSITIVE TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF** <br><br> **Date: May 31, 2012** <br> **Time: 3:30 p.m.** <br> **Location: Courtroom 10 (19th Floor)** <br> **The Honorable Susan Illston** |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................... 1

II. BACKGROUND ....................................................................................... 2

III. LEGAL FRAMEWORK ............................................................................ 5

IV. THE CLAM TERMS and THEIR PROPER CONSTRUCTIONS .................................... 5

    A.    "display means" (claims 38 and 41 of the '457 Patent and claims 10 and 11 of the '558 Patent). .................................................................5

    B.    "data representative of the demanded image is analyzed with respect to a currently displayed image"  (claims 2, 9, 16, and 24 of the '588 Patent)................8

    C.    "both the columns and the rows can be energized to one of a plurality of states" (claims 8 and 23 of the '588 Patent). .........................................9

    D.    "matrix display controller" / "controller for rendering a demanded image on a matrix display device" (claims 15 and 23 of the '588 Patent)..............................11

    E.    "matrix display device" (claims 1, 8, and 23 of the '588 Patent) / "matrix display" (claim 15 of the '588 Patent). ..................................................14

    F.    "selectively sending the row and column drive signals to the rows and columns respectively" (claims 1 and 15 of the '588 Patent)/ "selectively addressable rows and columns" (claim 22 of the '588 Patent)...........................14

    G.    "row and column drive signals" (claims 1 and 15 of the '588 Patent) .................16

    H.    "third means for providing, for the individual elements in the display means, signals representing the difference between the signals from the second and first means for such individual elements" (claim 10 of the '558 Patent)...............17

    I.    "third means responsive to the signals from the first and second means from the individual ones of the elements in the display means for providing signals representing the differences between the signals from the first and second means for such individual ones of the elements in the display means" (claim 38 of the '457 Patent)............................................................19

    J.    "fourth means for changing the images from the individual elements in the display means in accordance with the signals from the third means for such individual elements" (claim 10 of the '558 Patent). .............................................19

    K.    "fourth means responsive to the signals from the third means for providing for increases in the gray levels of the images in first elements in the display means in accordance with differences of one polarity as represented by the signals from the third means for such first elements and for providing for decreases in the gray levels of the images in second elements in the display means in accordance with differences of an opposite polarity as represented

by the signals from the third means for such second elements" (claim 38 of the '457 Patent)..........................................................................................................22

L.      "In combination" (preamble used in claims 38 and 41 of the '457 Patent and 10 and 11 of the '558 Patent).......................................................................24

V.      CONCLUSION...........................................................................................................24

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**CASES**

*Am. Med. Sys., Inc. v. Biolitec, Inc.*,
    618 F.3d 1354 (Fed. Cir. 2010) .................................................. 11

*Asyst Techs. Inc. v. Empak, Inc.*,
    268 F.3d 1364 (Fed. Cir. 2001) .................................................. 21

*Automed Techs. v. Knapp Logistics and Automation, Inc.*,
    2006 U.S. Dist. LEXIS 36908 (N.D. Ga. Jun. 6, 2006)........................... 22

*Bicon, Inc. v. Straumann Co.*,
    441 F.3d 945 (Fed. Cir. 2006) .................................................. 11

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
    358 F.3d 1371 (Fed. Cir. 2004) .................................................. 12

*Karlin Tech. Inc. v. Surgical Dynamics, Inc.*,
    177 F.3d 968 (Fed. Cir. 1999) .................................................... 5

*Khyber Techs. Corp. v. Casio Inc., et al.*,
    2004 U.S. Dist. LEXIS 15714 (D. Mass. Aug. 11, 2004) ..................... 22

*McCarty v. Lehigh Valley R.R. Co.*, 160 U.S. 110 (1895) .................... 14

*Nonin Medical, Inc. v. BCI, Inc.*,
    2004 U.S. Dist. LEXIS 3824 (D. Minn. Mar. 8, 2004) .......................... 6

*Optimal Recreation Solutions, LLP v. Leading Edge Techs., Inc.*,
    6 F. App'x. 873 (Fed. Cir. 2001) ................................................ 6

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ............................................. 5, 16

*Seachange Int'l, Inc. v. C-COR Inc.*,
    413 F.3d 1361 (Fed. Cir. 2005) .................................................. 5

*Talbert Fuel Sys. Patents Co. v. Unocal Corp.*,
    275 F.3d 1371 (Fed. Cir. 2002) .................................................. 9

*Welker Bearing Co. v. PHD, Inc.*,
    550 F.3d 1090 (Fed. Cir. 2008) .................................................. 6

**STATUTES**

35 U.S.C. § 112 ¶ 6............................................................ passim

## I.    INTRODUCTION

The inventions claimed in the patents-in-suit are circuitry for intelligently controlling matrix displays in flat panel screens.  The language, proper construction, and scope of the patent claims are widely acknowledged in the industry.   Leading manufacturers of flat-panel televisions, computer monitors, and e-readers—including LG Electronics, Inc., Philips Electronics, Polaroid Corp., NEC, Matsushita, Hitachi, Vizio, Viewsonic, and Toshiba—have all used the patented inventions for years under licenses from Plaintiff Positive Technologies.

Three issues form the foundation for virtually all of the parties' claim construction disputes.  First, Defendants seek to avoid infringement—or resurrect their failed motion for summary judgment—by urging the court to construe the disputed "means+function" claim terms to require functions that are not part of the claims or to require "structures" that are irrelevant or merely antecedent to the claimed functions.  Second, Defendants try to avoid infringement by arguing that certain claim language should be construed as "means+function" claim language even though it explicitly describes the structure for performing the function and thus cannot fall within 35 U.S.C. § 112 ¶ 6.  Third, Defendants hope to avoid infringement by rewriting the claim language so that it does not cover devices (like those of Defendants) that generate AC (alternating current) signals to control a display.   But Defendants' proposed "AC signal" constructions are based on an incorrect reading of an unrelated inventor's patent and directly contradicts the plain language of the claims, the specification, and the prosecution history.

To the extent the claim terms need to be construed, Positive's proposed constructions are based on and closely track the claim language and intrinsic evidence.  The extrinsic evidence, including the Expert Declaration of Raphael Merhbians in Support of Positive Technologies, Inc.'s Claim Construction, confirms that Positive's proposed construction for each disputed term reflects the understanding of a person of ordinary skill in the art at the time of the invention.  (Coburn Decl. Exh. 1, hereinafter "Merhbians Declaration" or "Merhbians Decl.")

The inventor, Robert Hotto, is a pioneer in the field of matrix display control technology, which uses overlapping sets of electrodes that cross at "pixels" to create images on a screen.  The pixels of a display take on various levels of gray between all black and all white based on the

voltage supplied to the pixel, and, in combination, are used to create the various shades of an image on the screen.  Because of certain characteristics of matrix addressable displays such as liquid crystal displays (LCDs) or electrophoretic displays (EPDs), the current gray scale level occupied by a pixel can affect how that pixel responds to the signals for the next image demanded from the display.

## II.   BACKGROUND

Mr. Hotto is the co-inventor of the personal digital assistant (PDA) and conceived of the claimed inventions in the late 1980s while working on conventional circuitry for controlling (or "driving") matrix displays.[1]  Twenty years ago, most displays and the circuits that controlled them were "dumb."  A dumb display controller merely supplied signals to the display one after the other.  New images were sent to the display, with no sense of where the pixels might already be located on the "gray scale" between black and white.  Thus, advantages were lost that might have been gained and display accuracy was less than desired.

Among other things, Mr. Hotto invented a system to use microprocessors and memory to provide drive signals to a matrix display based on both the current state of the pixels displaying an image and the characteristics of the next (or "demanded") image to be displayed.   In particular, the Hotto patents describe and claim a technology used to generate a drive signal for each pixel in response to both data representing the electro-optic conditions of pixels in a current display (*e.g.*, gray scale levels of pixels in a current display or previously stored data) and demanded image data (*e.g.*, data to be displayed on a display).  This technology adapts to the condition of the display and therefore, more accurately renders images demanded from the display and results in improved and more accurate displays in televisions, monitors, e-readers and many other applications.

A matrix display is a flat panel display device used in a variety of products such as televisions, monitors and e-readers.  It is characterized by intersecting sets of line-shaped

---

[1] Mr. Hotto also has inventions in fuel cells, turbines, visual voice mail and low-distortion communications, to name a few of the fields to which he has contributed.

electrodes often identified as "rows" and "columns."[2]  Matrix displays come in a variety of sizes and today, can include over one thousand columns intersecting with over one thousand rows resulting in over one million pixels at or adjacent to the intersections of the columns and rows.

Just as they all share the same basic structure, matrix displays rely on the convergence of a signal on a row with a signal on an intersecting column to change the apparent brightness or darkness of a pixel.  In an LCD matrix display, a change in the gray scale level of a pixel is a change in the amount of light that passes through the pixel while in an EPD matrix display, a change in the gray scale level of a pixel is a change in how light is reflected by the pixel.  All matrix displays exhibit, however, the same basic intersecting electrode structure and all rely on signal convergence at the pixels to cause images to appear on the display. To change the gray level of a pixel, external drive circuits called "drivers" are connected to related row and column electrodes to apply an electric field (voltage) across a pixel.  In an LCD, the electric field distorts the molecular orientation of the liquid crystal material to change how it passes light from behind and therefore the apparent brightness or darkness of the pixel.  In an EPD, the electric field is used to attract or repel black or white pigment particles in an ink to the front or back of the display panel,  with the particles closest to the front (viewing side) dominating the observed reflectance.  The electrical field can separate the particles to create a strong white or black reflective appearance, or can also partially mix the particles to create gray scale levels.

Many underlying technologies such as LCDs or EPDs have what is called a non-linear response between all black and all white.  That means that a drive signal that moves a pixel from a gray scale level of 0 to a gray scale level of 50 may be different than the drive signal that moves the state of that same pixel from 50 to 100 on the gray scale.   This is an artifact of the non-linear behavior of many matrix display technologies including LCDs, EPDs and plasma

---

[2]  The terms "rows" and "columns" are a convenient shorthand identification based on the relative orientation of the respective intersecting electrodes.  However, alternative nomenclatures are used in a variety of references and many of those alternative nomenclatures provide at least some information about the function of the named electrode.  For example, an electrode can be called a "source" electrode and it can be oriented either as a row or a column.  In an LCD matrix display the columns typically provide the source signal while in an e-reader EPD matrix display, the rows are typically the source electrodes.   What is sometimes called by the Hotto patents "an element" of the display is located at (or near) each intersection of a row and a column and those elements are typically called "pixels."

displays, all of which are configured as matrix displays and all of which rely on the basic principal of signal convergence on intersecting electrodes to change the state of the pixels.

Because of the non-linearity of matrix displays such as LCDs and EPDs, the best way to change the gray scale state of a pixel a certain amount varies depending upon the present level within the gray scale range.  Fig. 4 of the Hotto patents illustrates this principle.  In Fig. 4, the "brightness" of an LCD matrix display is shown plotted against the applied voltage.   As shown by Fig. 4 and pointed out in particular by the added voltage marks (i.e., V1, V2, V3) and corresponding gray scale marks (G1, G2, G3), the gray scale does not change in proportion to the applied voltage.[3]   As shown, a change in the voltage applied to a pixel from V1 to V2 results in a greater change in gray scale (from G1 to G2) than does the change in voltage from V2 to V3 (from G2 to G3) despite the fact that the change in voltage from V1 to V2 is the same as the change in voltage from V2 to V3.  This is an example of the non-linear response in matrix displays.



The Hotto inventions use knowledge about the current position of a pixel on the gray scale and what level that pixel must reach in the next cycle, to generate a drive signal that makes that pixel reach its goal more accurately.  To do this, however, requires computational and

---

[3] The added marks V1 and V2 and V3 represent three applied voltages with the difference in applied voltage between V1 and V2 represented as equal to the voltage change from V2 to V3.

memory horsepower.  Consequently, adoption of the Hotto inventions by industry was not to occur until the mid 1990's when the price and the capability of computational logic such as microcontrollers and microprocessors reached levels of performance required by the Hotto inventions.

## III.   LEGAL FRAMEWORK[4]

Claim construction begins with the claim language itself, and it is "unjust to the public, as well as an evasion of the law, to construe [a claim] in a manner different from the plain import of its terms."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (internal quotations omitted).  Claim terms "are generally given their ordinary and customary meaning" as understood by "a person of ordinary skill in the art in question at the time of the invention."  *Id.* at 1312-13.

A claim term is read "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Id.* at 1313.  However, "reading a limitation from the written description into the claims" is "one of the cardinal sins of patent law."  *Id.* at 1319-20.  The Court may also consult the prosecution history and extrinsic evidence, although extrinsic evidence, for example dictionaries and expert testimony, "is less significant than the intrinsic record in determining the legally operative meaning of claim language."  *Id.* at 1317 (internal quotation omitted).

When construing the language in one claim of a patent, due consideration must be given to the language in other patent claims.  The "claim differentiation" doctrine embodies the common sense notion that ordinarily language of one claim should not be so interpreted as to make another claim, such as a claim dependent on the first claim, identical in scope.[5]

## IV.   THE CLAM TERMS and THEIR PROPER CONSTRUCTIONS

### A.   "display means" (claims 38 and 41 of the '457 Patent and claims 10 and 11 of the '558 Patent).

---

[4]  This Court is keenly aware of claim construction guidelines.  Accordingly, Positive briefly summarizes the legal principles applicable to this case.

[5]  *See Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1368 (Fed. Cir. 2005); *Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999).

| POSITIVE'S PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|
| Matrix display<br><br>(not governed by Section 112, paragraph 6) | (governed by Section 112, paragraph 6)<br><br>Structure:  Passive or active-matrix LCD panel in which each pixel's gray level is not static but instead continually varies in intensity and with the level (but not polarity) of the voltage across the pixel as described at FIGS 1-4, 6; 2:52-67, 3:49-59, 13:25-37, 17:54-67, 1:65-22:2.<br><br>Function:  Display a gray level at each pixel according to the voltage level applied across the liquid crystal film in the pixel. |

The term "**display means**" is used in the asserted claims as follows:  "**display means formed from a plurality of elements each constructed to provide for the display of an image in accordance with the introduction of signals to such element**."  The use of the word "means" creates a presumption that the term is drafted in a means+function form.  This presumption collapses, however, if the term itself recites sufficient structure, material, or acts to perform the claimed function.  *Welker Bearing Co. v. PHD, Inc.,* 550 F.3d 1090, 1096 (Fed. Cir. 2008).  Accordingly, "***display means***" should not be treated as a means-plus-function limitation under 35 U.S.C. § 112 ¶ 6 because "display means" is a structural term.  *See id*.  Reciting that the "***display means [is] formed from a plurality of elements each constructed to provide for the display of an image***" removes any doubt that § 112 ¶ 6 does not apply.  Furthermore, being comprised of elements (*i.e.*, pixels) is the hallmark a matrix display.  (*See* Coburn Decl. Exh. 1, Merhbians Decl., at ¶¶ 22, 30, 32.)

Even if we were to assume that "**display means**" was covered by § 112 ¶ 6, the function would be simply "to display."  Then, we would evaluate whether sufficient structure is disclosed to perform the function.  Because "display" is both a noun and a verb it connotes structure and the presumption is rebutted.[6]  However, in the present case, the recited display means goes on to explain that the claimed matrix display is comprised of elements constructed in such a way as to provide an image when signals are applied to the respective elements.  (*See, e.g.*, Coburn Decl. Ex. 3, U.S. Patent No. 5,444,457, claim 38.)  This clearly discloses sufficient structure to

---

[6]  *See Optimal Recreation Solutions, LLP v. Leading Edge Techs., Inc.,* 6 F. App'x. 873, 878 (Fed. Cir. 2001) (unpublished) (holding that "display means" was structural); *Nonin Medical, Inc. v. BCI, Inc.*, 2004 U.S. Dist. LEXIS 3824, *16 (D. Minn. Mar. 8, 2004).

perform the function of displaying.  This claim term is not directed towards every means for displaying or every display.  It is only directed towards displays constructed to have certain properties.  Accordingly, "**display means**" is not governed by § 112 ¶ 6.

The fact that the "**display means**" is "**formed from a plurality of elements each constructed to provide for the display of an image**" further narrows it from a "display" to a "matrix display." (*See* Coburn Decl. Exh. 1, Merhbians Decl., at ¶¶ 22-33.)  A person of ordinary skill in the art would recognize that a "**display means formed from a plurality of elements each constructed to provide for the display of an image**" describes a matrix display.  (*See* Coburn Decl. Exh. 1, Merhbians Decl., at ¶¶ 22, 32.)   Although wrong in many respects, Defendants' proposed construction also incorporates the term "matrix."  Apparently, the parties agree that the claimed "display means" at least includes a "matrix display."

The construction of "display means" is further supported by the intrinsic record.  For example, as the file history of the '457 Patent shows, pending claim 94 was amended to change what had been an apparatus claim into a method claim.  (*See* Coburn Decl. Exh. 5, Pending Claim 94 of U.S. Patent Application No. 08/088,256.)   As shown by that amendment, the inventor directly substituted the term "*display*" for what had been stated as "*display means*" in the apparatus claim.   The change from apparatus claim to method claim shows that no function was related to the "*display means*" term in the apparatus form of the claim.  From this amendment, a person having ordinary skill in the art would have concluded that the inventor equated "*display means*" with the term "display."  (*See* Coburn Decl. Exh. 1, Merhbians Decl., at ¶ 23.)

From their proposed construction of "*display means*," it is readily apparent that Defendants identified the corresponding structure first, and then proposed a function supporting the desired result.  Because Defendants want to limit the claims to LCDs, they have identified the claimed function as displaying on an LCD ("applied across the liquid crystal film").  Defendants' backwards approach is confirmed by the fact that their proposed function includes the structural term "liquid crystal film."  Ironically, because "liquid crystal film" clearly connotes structure, albeit superfluous given the language already present in the claims, Defendants have confirmed

that § 112 ¶ 6 does not apply.

The overall thrust of Defendants' proposed construction is that the claims are limited to liquid crystal displays.  This is incorrect.  Claims 1 and 2 of the '457 Patent illustrate how, when the inventor wanted to limit the claims to LCDs, he did so using dependent claims.

> *"1.    In combination, display means formed from a plurality of elements each constructed to provide for the display of an image in accordance with the introduction of signals to such element ...."*

> *"2.    In a combination as set forth in claim 1, the elements constituting liquid crystal displays."*

(Coburn Decl. Ex. 3, U.S. Patent No. 5,444,457, claims 1 & 2.)

A person of ordinary skill in the art would understand that claim 2 limits the elements of the matrix display to LCDs, whereas claim 1 does not.[7]  (*See* Coburn Decl. Exh. 1, Merhbians Decl., at ¶¶ 34-36.)  It is worth noting that claim 2 narrows the elements of the display means and not the display means itself.  This is because the structure of the term "display means" has already been defined by reference to its elements.

### B. "data representative of the demanded image is analyzed with respect to a currently displayed image"  (claims 2, 9, 16, and 24 of the '588 Patent).

| POSITIVE'S PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|
| For each pixel, a numeric difference between data representative of the demanded image and data representative of a currently displayed image is determined. | for each pixel, the numeric difference between the demanded image array and the simulated current image is calculated |

The primary dispute between the parties regarding this term is "**calculated**" versus "**determined**."  Defendants apparently believe that if they can get the Court to determine that the operative word here is "***calculated***" rather than "***determined***," the look-up table implemented in e-readers would be less likely to be covered by the claims that include this term.  However, the common specification itself says that the MCU "***determines***" a numeric difference by using, amongst other techniques, "***comparison***" or "***logical operation***"[8]

---

[7] Claims 22, 25, and 26 of the '457 Patent and claims 38, 40 and 41 of the '457 Patent illustrate similar relationships.

[8] Sections of the common specification elsewhere refer to the difference as being "computed," but "computing" is simply one way of "determining."

> "MCU 12 determines a numeric difference between the corresponding values in memory by using known techniques such as comparison, arithmetic, and logical operation."

'588 Patent, Col. 15 ll. 6-9; '457 Patent, Col. 15 ll. 54-57; '558 Patent, Col. 15 ll. 8-11.

That is what the common specification says and that is what is done in e-readers.  Naturally, Defendants want a narrower word for this term, but based upon the specification and various ways the difference is handled in the specification, the correct word would be "***determined***."

Another issue raised by the competing interpretations of this term is the question of open or closed loop control of the display.  Although the relevant claims literally recite "***analyzed with respect to a currently displayed image***," the inventor made it clear that a simulation of the image is analyzed and not the currently displayed image itself.  As noted by the inventor,

> All existing LCD controllers, including the present invention, are open loop controllers (i.e. the display controller has no feedback from the actual display).

'588 Patent, Col. 5 ll. 1-3; '457 Patent, Col. 5 ll. 7-9; '558 Patent, Col. 4 ll. 64-66.

Clearly, the claims should not be construed to cover what the inventor acknowledges they cannot.[9]  For this reason, the specification describes the use of a simulation.[10]  Although the specification discloses the use of a simulation, for convenience, it is easier to refer to what is currently displayed.  However, the inventor made it clear that this is not what is literally meant.

> The system looks at the most recent demanded image in its entirety and compares it to what is presently on the display *(or more specifically, to the simulation of what is on the display)* [.]

'588 Patent, Col. 7 ll. 52-55; '457 Patent, Col. 8 ll.2-6; '558 Patent, Col. 7 ll. 47-50 (emphasis added).

Any allegation that the claims cover a "closed loop" system is simply without merit.

### C. "both the columns and the rows can be energized to one of a plurality of states" (claims 8 and 23 of the '588 Patent).

| POSITIVE'S PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|
| both the columns and rows can have their electrical conditions modified to occupy one of a plurality of | both the row electrodes and the column electrodes are configured to receive two or more distinct non-zero |

---

[9] *Talbert Fuel Sys. Patents Co. v. Unocal Corp.*, 275 F.3d 1371, 1376 (Fed. Cir. 2002) ("[A] construction that renders the claimed invention inoperable should be viewed with extreme skepticism."), *vacated and remanded on other grounds*, 537 U.S. 802 (2002).
[10] '588 Patent, 5:3-5; '457 Patent, 5:9-11; '558 Patent, 4:66- 5:1.

| POSITIVE'S PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|
| non-zero states | voltage drive signals, as well as zero voltage drive signals, in a manner and order that is image-dependent, such that the rows and columns are not driven in a predetermined sequence |

Plaintiff's proposed construction sticks very closely to the claim language.  Plaintiff's proposal clarifies that "*energized*" means to have "electrical conditions modified" and that the "*plurality of states*" is a "plurality of <u>non-zero</u> states."  A fact-finder might arrive at this understanding without construction, but there is no reason to leave this uncertain.  Defendants appear to agree that "non-zero" is at issue, although it isn't clear if they are referring to states.  Plaintiff also contends that adding the word "occupy" might be useful to the fact-finder.  Plaintiff believes that "occupy" is implicitly included in the phrase "*to [occupy] one of a plurality of states*."  Alternatively, one might have said "*to [be in] one of a plurality of states*;" "*to [end up in] one of a plurality of states*;" or simply left implicit.  In any case, Plaintiff's proposed constructions are supported by the claim language and will aid a fact-finder in assessing Defendants' infringement liability.

Defendants' proposed construction needlessly distorts the claim language and is not supported by the intrinsic record.  With minimal analysis of the claim language, one can see that "*energizing*" happens and the result is "*one of a plurality of states*."  Defendants' proposed construction is an attempt to construe what the columns and rows *receive* and not what the columns and rows *do* as required by the claim language.  There is no dispute that the rows and columns receive drive signals, but the properties of those "drive signals" is not a part of this term.[11]  Defendants have no basis to allege that the resulting state of the rows and columns (which is not mentioned) depends on whether those drives signals were "image-dependent" vs. "image-independent."  Another example of distorting the claim language is the final clause of Defendants' proposed construction, which is "such that the rows and columns are <u>not driven</u> in a predetermined sequence." (emphasis added).  Regardless of how the rows and columns are

---

[11] Plaintiff does not concede that the properties of "drive signals" implicit in Defendants' proposed construction are appropriate.  *See* term "row and column drive signals" at page 16, Section IV.G. of this brief.

1    driven, the issue is whether the result is "**one of a plurality of states**."  Here, it is unambiguously

2    clear that Defendants are not concerned with the claim term at issue and are instead attempting to

3    awkwardly import their infringement positions into the claims by defining "drive signals," rather

4    than the specific term at issue.  Defendants' infringement will be addressed at the appropriate

5    time and not during claim construction.

### D. "matrix display controller" / "controller for rendering a demanded image on a matrix display device" (claims 15 and 23 of the '588 Patent).

| POSITIVE'S PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|
| Plain and ordinary meaning of: electronics and programming that makes image signals from a graphic or video source understandable to a matrix display.<br><br>This is not a limitation (it is in preambles) and is defined in particular by the limitations that follow the respective preambles in which it is used. | device that provides row and column drive signals that do not change polarity in a predetermined and periodic fashion to effect an image's display on an LCD.  This excludes controllers using "alternating" drive signals such as those described in Bennett USP 5,034,736 at Fig. 4 and 8:16-57. |

12   As Positive's expert Raphael Merhbians states, "[t]hese terms are common and well-

13   understood terms in the field of displays and electronics used to control displays and as used in

14   the asserted claims, both terms refer to the electronics and programming that sends signals to a

15   display to cause it to render (display) images.  In short, a '*matrix display controller*' or

16   '*controller*' as used in these claims is something that makes the image signals from a graphics or

17   video source understandable to a matrix display.  As so understood, these terms have been in

18   common usage in the display business for decades and are so used in the Hotto patents.  This

19   understanding of these terms is the understanding that a person having ordinary skill in the art

20   would have had in the time frame of 1988-89."  (Coburn Decl. Exh. 1, Merhbians Decl., at ¶ I.)

21   Even under a proper construction, these terms are not claim limitations because they are

22   recited only in preambles and do not give life and meaning to their corresponding claims.  *See*

23   *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006); *see* also *Am. Med. Sys., Inc. v.*

24   *Biolitec, Inc.*, 618 F.3d 1354, 1358 (Fed. Cir. 2010).  These terms do not provide antecedent

25   basis for any subsequent claim limitations and can best be described as a short hand for the claim

26   itself.  As Expert Merhbians states, "[p]articular steps performed by or capable of being

27   performed by the claimed '*matrix display controller*' or '*controller*' or what features it has are

28   recited by the limitations of the claims."  (Coburn Decl. Exh. 1, Merhbians Decl., at ¶ I.)

15. A matrix display controller for controlling the energization of plural rows and plural columns in a matrix display to render a demanded image on the display, comprising:

logic means for processing data representative of the demanded image and storing processed data in electronic memory; and

logic means for generating row and column drive signals based on the processed data; and

logic means for selectively sending the row and column drive signals to the rows and columns, respectively, wherein the logic means for sending can send at least two of the drive signals simultaneously.

(Coburn Decl. Ex. 4, U.S. Patent No. 5,831,588, at col. 23 ll. 11-23.)

As can be seen above, the term "*matrix display controller*" is merely a reference to the collection of components that follow the word "comprising." The claim would have the same meaning and scope if the term "*matrix display controller*" were replaced with the term "widget" or "device."

Again, Defendants attempt to import limitations and define a term other than the one at issue. The first clause of Defendants' proposed construction recites: "device that provides row and column drive signals *that do not change polarity in a predetermined and periodic fashion* to effect an image's display on an LCD." (emphasis added). The italicized portion is an obvious attempt to define "drive signals" rather than a "*matrix display controller*." This is also another attempt to limit the claims to LCDs. (*See* "display means" above.) The second portion of Defendants' proposed construction attempts to explicitly exclude "'alternating' drive signals." Here, the attempt to define "drive signals" is explicit. This is another awkward attempt to import their infringement positions into the claims by defining "drive signals," rather than the specific term at issue.

If the inventor had wished to limit the claimed "*matrix display controllers*" or "*controllers*" to those that only produce direct current (DC) drive, he would have used such language.[12] The inventor knew how to do that. For example, the inventor used "DC power" and

---

[12] *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("we must construe the claims based on the patentee's version of the claim as he himself drafted it").

"DC voltage" in claims 63, 66, and 67 of the '280 Patent (parent to the patents-in-suit, the '280 shares the common specification) and there limited claims to DC drive.  The inventor, however, did not use "DC power" or "DC voltage" in claims 15 and 23 of the '588 Patent as a limitation for the respective claimed "*matrix display controller*" or "*controller*."  Instead, the inventor included certain limitations for the claimed devices and methods but did not, as the Defendants would want, include anything that limited those claims to devices and methods that do not produce or use an AC signal.

In addition to improper limitation importation, the Defendants' reliance on the Bennett reference (U.S. Pat. No. 5,034,736) is misplaced.  Positive believes that this assertion is based on a 05/26/94 Amendment in the file history of the '457 Patent as cited on page 29 of Defendants' Claim Constructions and Supporting Evidence.  Such reliance is a misrepresentation of the file history and more importantly irrelevant.  The cited portion of Bennett notes that the "optical state remains fixed *until such time as it is desired* to change the optical state."  Bennett, 8:51-53 (emphasis added).  This is neither periodic nor predetermined as alleged by Defendants.  This section says nothing more than at some unknown and arbitrary time in the future, when a change in optical state is desired, an opposite polarity pulse is transmitted.  This is shown by the discontinuity in Fig. 4 (Bennett) that indicates that the pulses are separated by an unknown period of time.



FIG. 4

The specification describes various advantages of using DC drive in the preferred embodiment, but does not exclude the use of AC drive in the claimed inventions of claims 15 and 23 of the '588 Patent.  There is no principled reason that the respective "*matrix display controllers*" or "*controllers*" should exclude those that produce alternating drive signals.

### E. "matrix display device" (claims 1, 8, and 23 of the '588 Patent) / "matrix display" (claim 15 of the '588 Patent).

| POSITIVE'S PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|
| matrix display | matrix of liquid crystal pixel elements in which the gray level of a pixel element is not affected by the polarity (positive or negative) of the drive signal |

These terms should be construed to refer to a matrix display. That is what the claim terms says and this is how it should be interpreted to comport with the understanding of a person of ordinary skill in the art at the time of the invention. (Coburn Decl. Exh. 1, Merhbians Decl., at ¶¶ 24-35, 42-43.)

Here again, Defendants import limitations into the claim terms to try to limit their exposure to infringement. EPDs as used in e-readers respond to the polarity of drive signals. Thus, Defendants add a limitation to require that the gray level of a pixel is not affected by the polarity of the drive signal. This is a blatant attempt by the e-reader Defendants to import limitations to avoid infringement.

### F. "selectively sending the row and column drive signals to the rows and columns respectively" (claims 1 and 15 of the '588 Patent)/ "selectively addressable rows and columns" (claim 22 of the '588 Patent)

| POSITIVE'S PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|
| rows and columns that can be addressed in one of a plurality of row and column combinations | [addressing the rows and columns / the rows and columns are address] in a manner and order that is image-dependent, such that the rows and columns are not driven in a predetermined sequence.<br><br>(see also listing of §112 ¶6 elements, below) |

Absent a clear disclaimer of claim scope, the Court must disregard Defendants' attempt to import limitations from the specification.[13] Defendants' position is simply untenable. Based on the parties' respective constructions, it is readily apparent that the operative term is "*selectively*."[14] It does not require a dictionary to understand that "*selectively*" requires a selection. The claim phrase recites that it is "***row and column drive signals***" that are being

---

[13] "[I]f we once begin to include elements not mentioned in the claim, in order to limit such claim, . . . we should never know where to stop." *McCarty v. Lehigh Valley R.R. Co.*, 160 U.S. 110, 116 (1895) *quoted by Philips v. AWH,* 415 F.3d 1303, 1312 (Fed. Cir. 2005).

[14] The parties appear to agree that "sending" is "addressing" and that "rows and columns" are what is being "addressed."

selected. This is the same logical process that the fact finder might employ and requires no further analysis. It is not clear if Defendants disagree about the plain and ordinary meaning of "*selectively*," but their proposed construction does not reflect it.

As discussed above, "*selectively*" does not merit construction, but out of caution, Plaintiff proposes that the entire term be construed as "rows and columns that can be addressed in one of a plurality of row and column combinations." This construction merely rephrases "selectively" in the context of the construed phrase. If the Court holds that a construction is necessary, then rephrasing is all that is required.

In contrast to the plain and ordinary meaning of "***selectively sending the row and column drive signals to the rows and columns respectively***," Defendants are attempting to import limitations from the specification. In addition to what is "selected" as recited by the claims, Defendants want to import how the selection is made ("in a manner and order that is image-dependent") and the result thereof ("such that the rows and columns are not driven in a predetermined sequence").

Beginning with the specification, Defendants have cited passages 10:32-40 and 11:40-50 of the '588 Patent in support of an alleged disclaimer of claim scope. (Defendants' Rule 4-3b Disclosure at 43-44 (Doc. 262-5).) The cited passages of the common specification discuss "selective interchange of functions of row and column electrodes." ('588 Patent, 10:10:34-33; *see also id.* at 11:42-43.) However, the portions cited by Defendants identify themselves as the fifth of five addressing schemes of their respective sections. (*Id.* at 10:32-40, 11:40-50.) In contrast, the first addressing scheme of those respective sections describes methods in which "one backplane electrode is selected at a time in a fixed sequential order." (*Id.* at 9:54-55; *see also id.* at 11:7-8.) It is readily apparent that the claimed invention covers sequential (*i.e.*, predetermined) row addressing techniques as well as image-dependent row addressing techniques. This is equivalent to going to an ice cream shop and always selecting the same flavor even if other selections are available. Under Defendants' proposed construction, it is not "selective" unless a different flavor is chosen every time. The patents-in-suit enable the ability to make different selections, but that does not disclaim making the same selection every time.

Defendants' citation to the prosecution history of the patents-in-suit is equally unavailing. For example, one of Defendants' prosecution history citations recites:

> In prior art matrix controllers including those of multi-line selection variety (the Motif Active Addressing and the Optrex MLS) the row selection is *always* fixed and independent of the desired image.

Defendants' Rule 4-3b Disclosure at 46 (quoting PTI00000846) (emphasis added). (Doc. 262-5.) Defendants have overlooked the critical phrase "always." Defendants' position is that because "*selectively*" <u>can be</u> image-dependent that it <u>must</u> be image-dependent. This is a clear example of importation into the claims and must be rejected.

This is a simple term with a simple construction. It only appears complicated because Defendants have made it so. If this term must be construed at all, it should be construed as "rows and columns that can be addressed in one of a plurality of row and column combinations."

### G. "row and column drive signals" (claims 1 and 15 of the '588 Patent)

| POSITIVE'S PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
| --- | --- |
| voltages applied to the electrodes of the matrix display | voltages applied to the electrodes of the matrix display that do not change polarity in a predetermined and periodic fashion, excluding alternating drive signals such as those described in Bennett USP 5,034,736 at Fig. 4 and 8:16-57. |

The term "*row and column drive signals*" does not need a separate construction by the Court. Instead, the plain meaning of this term is sufficiently clear to direct the jury's infringement fact-finding without further explanation by the Court.[15] The term "drive signal" appears throughout the specifications, including in descriptions of prior art and embodiments of the present inventions. For example, the specifications disclose that "[f]or prior art, the polarity of the drive signal is reversed at a fixed frequency that is between every 400th to 30th of a second." ('558 Patent, 2:18-20; '457 Patent, 2:21-24; '588 Patent, 2:21-23.) Thus, contrary to Defendants' proposed construction, the inventor intended using the term "*drive signal*" to

---

[15] *See Phillips*, 415 F.3d at 1314 (noting that if terms use "commonly understood words," then "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent….").

include at least alternating current (AC) drive.[16]  Furthermore, nowhere does the common specification give "***drive signal***" a meaning different from its ordinary meaning.  The Defendants' construction to "exclude" alternating drive signals is incorrect.

Despite the clear meaning of "drive signal," Defendants seek to import limitations from the written description and dependent claims, arguing that "***row and column drive signal***" means voltages applied to the electrodes of the matrix display that do not change polarity and exclude alternating drive signals.  Defendants' suggested importation of limitations is legally improper. Rather than repeat the arguments here, Positive refers the Court to the discussion of AC drive signals in subsection D above regarding "***matrix display controller***." [17]

If the Court deems construction of "***row and column drive signals***" necessary, Positive's construction should be adopted as it reflects the term's plain, ordinary meaning.

### H.  "third means for providing, for the individual elements in the display means, signals representing the difference between the signals from the second and first means for such individual elements" (claim 10 of the '558 Patent).

| POSITIVE'S PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|
| Means-plus-function limitation under 35 U.S.C. Section 112, paragraph 6: <br><br> Structure:  A microcontroller programmed to provide for the individual pixels, signals that numerically represent the difference between the signals from the second means (i.e. RAM) and the first means (i.e., video RAM) (See e.g., MCU 12) <br><br> Function:  providing signals that numerically represent a difference between the signals from the second means (i.e., RAM) and the first means (i.e., video RAM) for the individual pixels. | Means-plus-function limitation under 35 U.S.C. Section 112, paragraph 6: <br><br> Structure:  MCU 12 programmed to compute the numeric difference between the stored byte values respectively representing the two signals, the demanded image array stored in VRAM and the simulated image array stored in a block of memory in RAM 16, byte by byte as depicted in Fig. 7 and store the results in the difference array in a block of memory in RAM 16, as described at FIGS. 1, 7, 15:47–16:2, 18:18-24, 19:49-53. <br><br> Function:  Compute the byte-by-byte numeric difference of the demanded image array in VRAM and the simulated image array in RAM and store the results in the difference array in RAM. |

The functional language of the claim is clear—providing signals that represent the difference between two inputs, demanded image data (*i.e.*, the signals provided by the first

---

[16] *See also* '457 Patent, 2:59-3:31, '588 Patent, 2:59-3:27, '558 Patent, 2:56-3:26 (using the term "drive signal" to refer to "prior art fixed cycle AC matrix drive").

[17] Plaintiff has already discussed the Defendant reliance on *Bennett* and refers the Court to page 13 of this brief.

means (*e.g.*, video RAM 18)) and currently displayed image data (*i.e.*, signals provided by the second means (*e.g.*, RAM 16)).   The structure that performs this function is the microcontroller (*e.g.*, MCU 12) programmed to provide such signals representing that difference.

In the digital world in which the Hotto patents operate, the provided difference is expressed in numeric form.   Defendants, however, seek to improperly read a "compute" limitation into this term.   The language of the claim merely requires providing a signal that represents the difference between the two inputs: pixel data in a demanded image and pixel data representative of a currently displayed image.   Reading a mathematical difference calculation or computation into this element violates long-accepted canons of claim construction because doing so imports unnecessary functional limitations from the specification into the claim.   Defendants seek to conflate functional and structural issues in the means+function analysis in order to limit the scope of the functional language in the claims.   This is improper at *Markman*.   A jury must eventually consider whether the structures disclosed in the common specification are the same as or equivalent to the structures employed in the accused products for performing the recited functions.   Consequently, to limit the functional language by injecting unstated limitations also limits the ability of the jury to determine whether the structures of the accused products are the same or equivalent to the structures disclosed in the common specification for performing the <u>functions recited in the claims, as opposed to the descriptions of the specification</u>.   As to structure, the specification says,

> MCU 12 determines a numeric difference between the corresponding values in memory by using known techniques such as comparison, arithmetic, and logical operation.

'588 Patent, Col. 15 ll. 6-9; '457 Patent, Col. 15 ll. 54-57; '558 Patent, Col. 15 ll. 8-11.

It is, therefore, the microcontroller that performs the recited function and provides the signals that represent the difference between the signals from the second (*e.g.*, RAM) and first means (*e.g.*, video RAM) for such individual elements.   It does so in a variety of ways exemplified in the specification by the examples of comparison, arithmetic, and logical operation, but these are examples and there is no need to limit the claim by putting "computational" limits upon its interpretation.   If some vehicle for the provision of the signals

that represent the difference must be found, it should be said that the microcontroller is programmed to "determine" the signals.

**I.** **"third means responsive to the signals from the first and second means from the individual ones of the elements in the display means for providing signals representing the differences between the signals from the first and second means for such individual ones of the elements in the display means" (claim 38 of the '457 Patent)**

| POSITIVE'S PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|
| Means-plus-function limitation under 35 U.S.C. Section 112, paragraph 6:<br><br>Structure:  A microcontroller programmed to provide for the individual pixels, signals that numerically represent the differences between the signals from the first means (i.e., video RAM) and the second means i.e., RAM) (See e.g., MCU 12)<br><br>Function:  providing signals that numerically represent differences between the signals from the first means (i.e., video RAM) and the second means (i.e., RAM) for individual pixels. | Means-plus-function limitation under 35 U.S.C. Section 112, paragraph 6:<br><br>Structure: Same as "third" means of claim 10 of the '558 patent<br><br>Function: Same as "third means" of claim 10 of the '558 patent |

The functional language of the claim is clear—providing signals that represent differences between two inputs, demanded image data (which are the signals provided by the first means (*e.g.*, video RAM 18)) and currently displayed image data (which are provided by the second means (*e.g.*, RAM 16)).   This differs from the "third means" of claim 10 of the '558 Patent in that this term refers to plural "differences" while the "third means" of claim 10 refers to the singular "difference."

The structure that performs the function recited by this term is the microcontroller (*e.g.*, MCU 12) programmed to provide such signals representing the differences.  The rationales and observations concerning the parties' offered constructions for the "third means" of claim 10 are applicable here as well.

**J. "fourth means for changing the images from the individual elements in the display means in accordance with the signals from the third means for such individual elements" (claim 10 of the '558 Patent).**

| POSITIVE'S PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|
| Means-plus-function limitation under 35 U.S.C. Section 112, paragraph 6:<br><br>Structure:  row and column drivers (*See e.g.,* row and | Means-plus-function limitation under 35 U.S.C. Section 112, paragraph 6:<br><br>Structure:  MCU 12 including queued serial interface |

| POSITIVE'S PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|
| column drivers 24 and 26)<br><br>Function:  changing the images from the individual pixels in accordance with the signals from the third means (i.e., programmed microcontroller) for such individual pixels | (QSI) and time processor unit (TPU), RAM 16, row and column drivers HVO4 configured to drive row and column electrodes both selectively and simultaneously using drive signals that do not change polarity in a predetermined and periodic fashion, LCD 10, as described at FIG. 1, 8:11–14, 15:29–46, 16:3–46 1:22-68, 3:1-6, 3:32-48, 5:27-31, 5:40-6:53, 6:58-8:14, 8:15-19:23, 9:31-34, 9:54-67, 10:1-12:16<br><br>Function: Beginning with difference array in RAM, realize a displayed image on the LCD, by computing the drive signal and sending it by addressing the rows and columns in a manner and order that is image-dependent, such that the rows and columns are not driven in a predetermined sequence, and using drive signals that do not change polarity in a predetermined and periodic fashion. This excludes "alternating" drive signals such as those described in Bennett USP 5,034,736 at Fig. 4 and 8:16-57. |

One can scarcely imagine a more striking example of importing limitations into the specification than Defendants' proposed construction for this term.   The words of the claim are the starting point for determining the claimed function.   Presumptively, the function of the "*fourth means for changing the images from the individual elements in the display means in accordance with the signals from the third means for such individual elements*" as recited by claim 10 is "*changing the images from the individual elements in the display means in accordance with the signals from the third means for such individual pixels*."   This is the baseline from which proposed constructions must be measured.

Although Plaintiff believes that no construction is necessary, a further simplification of the claimed function may be useful to the Court.   The claimed function is nothing more than changing the output of the matrix display in accordance with the instructions from the microprocessor.   The actual language is slightly more complicated in that it notes that the matrix display is comprised of pixels and that the output image from the display is technically the combined output images from the individual pixels.   However, Plaintiff has not asked the Court to clarify this term in this manner.   For sake of convenience, Plaintiff has proposed including the fact that the third means is a microprocessor since the term "third means" isn't intuitive. However, Plaintiff would be amenable to removing this clarification at the Court's discretion.

Defendants' proposed construction of the claimed function is so distant that the claim language cannot be identified within their proposal. It includes at least twelve different concepts:

> (1) Beginning with difference array (2) in RAM, (3) realize a displayed image (4) on the LCD, (5) by computing the drive signal and (6) sending it (7) by addressing the rows and columns (8) in a manner and order that is image-dependent, (8) such that the rows and columns are not driven in a predetermined sequence, and (9) using drive signals that do not change polarity (11) in a predetermined and periodic fashion. (12) This excludes "alternating" drive signals such as those described in Bennett USP 5,034,736 at Fig. 4 and 8:16-57.

Apparently, it is Defendants' contention that when the patentee used the term "changing the images from the individual pixels [of the display]" that he really meant twelve different things. Other than "realize a displayed image," the concepts proposed by Defendants are nothing more than an attempt to avoid infringement. Of particular note is Defendants' attempt to require the use of an LCD—again, and the "selectively sending" argument—again. Absent a good reason to deviate, which Defendants do not have, a claim means what it says.

Under Plaintiff's proposed construction, the row and column drivers perform the claimed function of "changing the images from the individual pixels in accordance with the signals from the third means (*i.e.*, programmed microcontroller) for such individual pixels."[18] It is undisputed that the row and column drivers are connected to the electrodes of the matrix display, and that it is these electrodes that control the state of each pixel. As their name would suggest, row and column drivers drive the rows and columns of a corresponding matrix display. This is all that is needed to perform the claimed function of changing the matrix display.

Because Defendants' proposed function is wrong, it logically follows that their proposed corresponding structure is also wrong. However, Defendants' proposed corresponding structure goes well beyond a faulty premise. Not only do Defendants include structures that perform tasks that are at best antecedent to the actually recited function,[19] it is Defendants' contention that the

---

[18] *See* Coburn Decl. Ex. 2, U.S. Patent No. 5,627,558, at col. 13 ll. 56-60 and Fig. 1, elements 10, 24, 26.

[19] *Asyst Techs. Inc. v. Empak, Inc.*, 268 F.3d 1364, 1370 (Fed. Cir. 2001) ("Structural features that do not actually perform the recited function do not constitute corresponding structure and thus do not serve as claim limitations"). *Id.* at 1371 ("An electrical outlet enables a toaster to work, but the outlet is not for that reason considered part of the toaster. The corresponding

claimed invention is limited by the specific part numbers utilized in the preferred embodiment, such as an HV04 display driver manufactured by Supertex. Although not explicitly stated, Defendants also rely on certain eccentricities of the Motorola MC68332, such as a queued serial interface (QSI) and a time processor unit (TPU). Despite the absurdity of this position, Defendants are not even consistent. For example, unlike the other components, the RAM is not limited to a Toshiba TTC51400AP as disclosed in the specification. Under any claimed function, there is no support for limiting the corresponding structure so narrowly.[20]

> **K. "fourth means responsive to the signals from the third means for providing for increases in the gray levels of the images in first elements in the display means in accordance with differences of one polarity as represented by the signals from the third means for such first elements and for providing for decreases in the gray levels of the images in second elements in the display means in accordance with differences of an opposite polarity as represented by the signals from the third means for such second elements" (claim 38 of the '457 Patent).**

| POSITIVE'S PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|
| Means-plus-function limitation under 35 U.S.C. Section 112, paragraph 6:<br><br>Structure: row and column drivers (*See e.g.*, row and column drivers 24 and 26)<br><br>Function: for providing for increases in the gray levels of the images in one group of pixels of the display in accordance with differences of one polarity as represented by the signals from the third means (i.e., programmed microcontroller) for that group of pixels and for providing for decreases in the gray levels of the images in another group of pixels of the display in accordance with differences of an opposite polarity as represented by the signals from the third means (i.e., programmed microcontroller) for that other group of pixels. | Means-plus-function limitation under 35 U.S.C. Section 112, paragraph 6:<br><br>Structure: MCU 12 programmed to carry out block 66 of Figure 7, as described at 19:5-13. Said "drive voltages" do not change polarity in a predetermined and periodic fashion. See also citations to intrinsic evidence for "drive signals."<br><br>Function: Effect changes in charges on pixels according to the difference array, addressing the rows and columns in a non-deterministic and image-dependent manner, such that the rows and columns are not driven in a predetermined sequence, and using drive signals that do not change polarity in a predetermined and periodic fashion. This excludes "alternating" drive signals such as those described in Bennett USP 5,034,736 at Fig. 4 and 8:16-57. |

Defendants earlier identified the third means of claim 38 of the '457 Patent as being:

---

structure to a function set forth in a means-plus-function limitation must actually perform the recited function, not merely enable the pertinent structure to operate as intended . . .").

[20] *See Automed Techs. v. Knapp Logistics and Automation, Inc.*, 2006 U.S. Dist. LEXIS 36908, *36 (N.D. Ga. Jun. 6, 2006) (holding that limiting corresponding structure to specific models to be "unnecessary surplusage and an unwarranted limitation on the structure required"); *Khyber Techs. Corp. v. Casio Inc.*, 2004 U.S. Dist. LEXIS 15714, *19-20 (D. Mass. Aug. 11, 2004) (holding that corresponding structure should not be limited to "particular features found in the exemplar microcontroller referred to [by the specification]").

MCU 12 programmed to compute the numeric difference between the stored byte values respectively representing the two signals, the demanded image array stored in VRAM and the simulated image array stored in a block of memory in RAM 16, byte by byte as depicted in Fig. 7 and store the results in the difference array in a block of memory in RAM 16, as described at FIGS. 1, 7, 15:47–16:2, 18:18-24, 19:49-53.

The primary identified structure for the third means is MCU 12.   The fourth means recited above is said by its own terms to be "***responsive to the signals from the third means….***" Yet, here, Defendants offer that the "fourth means" structure is also MCU 12.   Therefore, according to Defendants, MCU 12 is responsive to signals from MCU 12.   That is very likely to lead to trouble for the jury.  Positive suggests, and common sense and a basic appreciation of the invention compel, a different result.

Below is a basic map showing the structures that perform the recited functions of the respective "first means …," "second means …," "third means…," and "fourth means …" of the asserted independent claims of the '457 and '558 Patents:



In addition to their odd infinite loop that has the MCU of their fourth means respond to the MCU of their third means, Defendants repeat here much of their earlier construction argument for the fourth means of the '558 Patent.  In the interests of brevity, Positive repeats by reference here its observations and argument as to the fourth means of claim 38.   In short, it is the row and column drivers that are responsive to signals from the MCU (i.e., the third means)

for providing for increases and decreases in the gray level of pixels in this claim as recited in this fourth means.

### L. "In combination" (preamble used in claims 38 and 41 of the '457 Patent and 10 and 11 of the '558 Patent)

| POSITIVE'S PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|
| Not closed form<br>No construction necessary | Closed form |

The term "*in combination*" is used in the preambles of several asserted claims.  Contrary to Defendants' assertion, there is no reason to consider this term to exclude other components. Unlike in chemistry, for example, where the scope of a claimed ingredient can be closed to added features by use of the term "consisting of," the term "*in combination*" does not by its use close the Hotto claims to features not specifically recited.  If the phrase "*in combination,*" closed these claims to other "ingredients" (to use the chemistry parlance), the PTO Examiners would not have cited display controller art that included any ingredients beyond elements they believed presented alone or in combination the recited limitations of the pending claims.  In contrast to that minimalist prospect, the Examiners cited systems where features other than the recited limitations are found.  Had the Examiners of the Patent and Trademark Office subscribed to Defendants' theory, they would not have wasted their time on such art and Defendants would not have produced their over 3000 page invalidity contentions.

"*In combination*" has a clear and straightforward meaning.  It does not mean "solely in combination."  It does not mean "in a combination consisting of."  Wearing in combination a shirt, pants, and a jacket, does not exclude the possibility of also wearing shoes or a hat.  Only because Defendants have raised it, does the Court need to hold that "in combination" means what it says.  The Court should reject Defendants' odd contention that the use of the introductory preamble term "*in combination*" means that the claimed invention includes *only* the recited limitations.

## V.    CONCLUSION

For the foregoing reasons, Positive respectfully requests that the Court adopt Positive's proposed constructions and reject those of the Defendants.

1

2
                                               Respectfully Submitted,

3
Dated: February 24, 2012                           ___/s/ J. Scott Denko_____

4
                                           J. Scott Denko (*Pro Hac Vice*)

5
                                         (Texas State Bar No. 00792457)

Respectfully Submitted,

Dated: February 24, 2012

   ___/s/ J. Scott Denko_____
    J. Scott Denko (*Pro Hac Vice*)
   (Texas State Bar No. 00792457)
   Bradley D. Coburn (*Pro Hac Vice*)
   (Texas State Bar No. 24036377)
   Steven J. Lauff (*Pro Hac Vice*)
   (Texas State Bar No. 24013011)
   DENKO COBURN & LAUFF LLP
   1501 S. MoPac Expy., Suite A315
   Austin, TX 78746
   Telephone: (512) 906-2074
   Facsimile: (512) 906-2075
   Email: denko@dcllegal.com
   coburn@dcllegal.com
   lauff@dcllegal.com

   Perry R. Clark
   LAW OFFICES OF PERRY R. CLARK
   825 San Antonio Road
   Palo Alto, CA 94303
   Telephone: (650) 248-5817
   Facsimile: (650) 618-8533
   Email: perry@perryclarklaw.com

   R. James George, Jr. (*Pro Hac Vice*)
   (Texas State Bar No. 07810000)
   GEORGE & BROTHERS LLP
   1100 Norwood Tower
   114 W. 7th Street
   Austin, Texas 78701
   Telephone: (512) 495-1400
   Facsimile: (512) 499- 0094
   Email:  rjgeorge@georgeandbrothers.com