1

2

3

4

5              IN THE UNITED STATES DISTRICT COURT

6             FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8    POSITIVE TECHNOLOGIES, INC.,              No. C 11-02226 SI

9              Plaintiff,                       **CLAIM CONSTRUCTION ORDER**

10         v.

11   SONY ELECTRONICS, INC.; DELL,
     INC.; ASUS COMPUTER INTN'L.; MSI
12   COMPUTER CORP.; AMAZON.COM,
     INC.; BARNES & NOBLE, INC.; and
     KOBO, INC.,

13
              Defendants.
14   _____/

15

16         On June 6, 2011, the Court held a *Markman* hearing regarding the construction of certain

17   disputed claims in three patents owned by plaintiff.  Having considered the arguments of counsel and

     the papers submitted, the Court construes the disputed claims as follows.
18

19
                              **BACKGROUND**
20

21         This is a patent infringement action filed by plaintiff Positive Technologies, Inc. ("Positive")

22   against a number of defendants which manufacture, market, or sell "several types of consumer

     electronics, including but not limited to laptop computers, desktop computers, all-in-one computers, and
23
     e-readers incorporating an LCD or electrophoretic display panel utilizing display acceleration
24
     techniques" claimed in the patents.[1]  Compl. ¶ 29.  Plaintiff alleges infringement of three of its patents,
25

26   _____
            [1] The allegations against defendants Acer America Corporation, Asus Computer International,
27   Dell, Inc., Gateway, Inc., and MSI Computer Corporation include, without limitation,  infringement
     related to LCD displays. The allegations against Sony Electronics, Inc., Amazon.com, Inc., Barnes &
28   Noble, Inc., and Kobo, Inc. include, without limitation, both LCD and electrophoretic (EPD) display
     technologies.

**United States District Court**
**For the Northern District of California**

U.S. Patent No. 5,444,457 ("the '457 Patent"), issued on August 22, 1995; U.S. Patent No.5,627,558 ("the '558 patent"), issued on May 6, 1997; and U.S. Patent No. 5,831,588 ("the '588 patent"), issued on November 3, 1998 (collectively, the "patents-in-suit").

According to the complaint, Positive's founder and principal owner, Robert Hotto, is the named inventor on 31 U.S. patents and several pending U.S. patent applications in a wide range of mechanical and electronic devices.  In 1991, Hotto filed the patent application that later issued as U.S. Patent No. 5,280,280 ("the '280 Patent"), titled "DC Integrating Display Driver Employing Pixel Status Memories," the parent patent of the patents-in-suit.  Compl. ¶ 20.  The technology at issue concerns circuitry for intelligently controlling matrix displays in flat panel screens.  The three patents-in-suit share the same specification and figures.  The invention seeks to improve the manner in which drive signals are applied to individual picture elements (i.e., pixels)[1] in a screen through several innovative steps.

The invention consists of a circuit that controls the output of images onto a display.  The major innovative step of the invention is that it receives data representing a desired image and compares it to the stored simulation of the image currently on display on a screen.  The microprocessor then determines the optimal order and voltage of the drive signals, and sends the appropriate signals to the individual pixels in the display.  The patents name the first innovative aspect of the invention the "Real Time Display Simulation," which stores a constantly updated simulation of the current image in a random access memory ("RAM") storage location. *See* '457 Patent,1:65-68. The circuit analyzes the difference between the existing condition of the display and the next image to be displayed ("demanded image") stored in the video-random access memory ("VRAM"), as well as the accumulated direct current ("DC") bias (which refers to accumulated electrical charge) on the current pixels. *See*, '457, 15:54-60.  Whereas prior art "dumb" circuitry sent signals to pixels without considering their current state, the invention "intelligently" considers that state and factors in various aspects of that state before sending new

---

[1]  "Pixel" is a coined word, combined from "picture" or "pix" and "element."  '457, 1:15-17. The word "pix" appeared in *Variety* magazine headlines in 1932, as an abbreviation for the word "pictures," in reference to movies. By 1938, "pix" was being used in reference to still pictures by photojournalists.  The word "pixel" was first published in 1965 by Frederic C. Billingsley of Jet Propulsion Labs, to describe the picture elements of video images from space probes to the Moon and Mars. *See* http://en.wikipedia.org/wiki/Pixel (last visited, 7/3/12).

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1

2　information.　The other innovative aspects are "Selective Real Time Drive Sequencing," which

3　determines the best order sequence for the electrode drives based on the current image, and "Pixel

4　Power Modulation," which allows for the control of voltage applied to an individual pixel.　'457 Patent,

5　2:35-40.

6　　　　　Defendants dispute the scope of the invention with respect to the electrophoretic display (EPD)

7　type, which contains similar fundamental structure to liquid crystal displays ("LCDs") but utilizes a

8　layer of different electro-optical material.　Both EPD and LCD displays are types of matrix displays.

9　Pl.'s Opening Claim Const. Br. at 3.　The underlying structure of these displays is a matrix of

10　intersecting rows and columns of electrodes that delivers a desired voltage to each intersection; each

11　intersection forms a pixel in the display (sometimes called an "element" in the patents).　Parallel to the

12　matrix of electrodes, both display types contain a layer of electro-optical material between two plates

13　of glass.　LCD displays utilize a variety of liquid crystal types, while EPD displays utilize a layer of

14　microcapsules filled with electrically charged dye particles, which exhibit somewhat different electrical

15　response properties.　*Id.; see also* Drabik Decl., Dkt. 273-1　¶¶ 30, 35.　In both cases, voltage applied

16　to the pixel changes the orientation of the crystals or particles so that the pixel appears darker or lighter.

17　The invention utilizes knowledge about the current condition of each pixel and what level that pixel

18　must reach in the next image to generate a more accurate drive signal.　This improvement in accuracy

19　is particularly significant for all pixel types that exhibit a response in greyscale that is not directly

20　proportional to applied voltage (i.e., non-linear), which includes both LCD and EPD displays.

21　　　　　Defendants seek to limit the patent language to LCDs only, while plaintiff contends the patent

22　language addresses all matrix displays and uses LCDs only as examples.　Thus, the threshold question

23　with respect to many of the disputed terms is whether LCD-specific limitations may be read into the

24　claims of the patents.　These limitations include LCD-specific signal properties that would account for

25　different responses to voltage polarity exhibited by the liquid crystals and the EPD microcapsules.

26

27　　　　　　　　　　　　　　　　　　**LEGAL STANDARD**

28　　　　　Claim construction is a matter of law.　*Markman v. Westview Instr., Inc.*, 517 U.S. 370, 372

(1996). Terms contained in claims are "generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1312. In determining the proper construction of a claim, a court begins with the intrinsic evidence of record, consisting of the claim language, the patent specification, and, if in evidence, the prosecution history. *Id.* at 1313; see also *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "The appropriate starting point . . . is always with the language of the asserted claim itself." *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998); see also *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997).

Accordingly, although claims speak to those skilled in the art, claim terms are construed in light of their ordinary and accustomed meaning, unless examination of the specification, prosecution history, and other claims indicates that the inventor intended otherwise. See *Electro Medical Systems, S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1053 (Fed. Cir. 1994). The written description can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format. *SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337, 1344 (Fed. Cir. 2001). In other words, the specification may define claim terms "by implication" such that the meaning may be "found in or ascertained by a reading of the patent documents." *Vitronics*, 90 F.3d at 1584 n.6.

While claims are interpreted in light of the specification, this "does not mean that everything expressed in the specification must be read into all the claims." *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957 (Fed. Cir. 1983). For instance, limitations from a preferred embodiment described in the specification generally should not be read into the claim language. See *Comark*, 156 F.3d at 1187; *see also Decisioning.com, Inc. v. Federated Dep't Stores, Inc.*, 527 F.3d 1300, 1314 (Fed. Cir. 2008) ("[The] description of a preferred embodiment, in the absence of a clear intention to limit claim scope, is an insufficient basis on which to narrow the claims."); *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1345-46 (Fed. Cir. 2008) (refusing to limit claim language to the disclosed embodiment in the absence of indication that the inventor meant to limit the claim language). However, it is a fundamental rule that "claims must be construed so as to be consistent with the specification."

United States District Court
For the Northern District of California

*Phillips*, 415 F.3d at 1316.  Therefore, if the specification reveals an intentional disclaimer or disavowal of claim  scope, the claims must be read consistently with that limitation.  *Id.*

Finally, the Court may consider the prosecution history of the patent, if in evidence.  *Markman*, 52 F.3d at 980.  The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.  *See Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).   In most situations, analysis of this intrinsic evidence alone will resolve claim construction disputes.  *See Vitronics*, 90 F.3d at 1583.   Courts should not rely on extrinsic evidence in claim construction to contradict the meaning of claims discernable from examination of the claims, the written description, and the prosecution history.  *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583). However, it is entirely appropriate "for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field."  *Id.*   Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises."  *Phillips*, 415 F.3d at 1317.   All extrinsic evidence should be evaluated in light of the intrinsic evidence.  *Id.* at 1319.

## DISCUSSION

The parties agree that the term "simultaneously" shall be construed as "at the same time."  Joint Claim Construction, Dkt. 262 at 2.  The parties also agree that "display means" and "matrix display device" are limitations despite being introduced in the preambles of the respective claims.   The parties further agree that a person having ordinary skill in the art circa 1989 would be an individual with a BS in electrical engineering and 3 to 4 years of experience in the field of matrix displays and display controllers, or an MS degree and 1 to 3 years of relevant work experience.  The asserted claims are claims 38 and 41 of the '457 patent, claims 10-11 of the '558 patent, and claims 2, 5, 8-9, 16, 19, 22, 23, and 24 of the '588 patent.

**United States District Court**
For the Northern District of California

1.      **Matrix Display [Device]**

The term **matrix display device** appears in independent claims 1, 8, and 23, while the term **matrix display** appears in independent claim 15 of the '588 patent. *See* '588, 22:13-16, 45-50;  24:4-9; 23: 11-14.  The context is as follows:

> **Independent claim 1**: A method for rendering a demanded image on a **matrix display device** including a plurality of rows and a plurality of columns, comprising the steps of [...].

> **Independent claim 8**: A method for rendering a demanded image on a **matrix display device** including plural rows and plural columns, the rows and columns being energized by respective drive circuitry, the drive circuitry being configured such that both the columns and the rows can be energized to one of a plurality of states in response to the demanded image.

> **Independent claim 23**: A controller for rendering a demanded image on a **matrix display device** including plural rows and plural columns, the rows and columns being energized by respective drive circuitry, the drive circuitry being configured such that both the columns and the rows can be energized to one of a plurality of states in response to the demanded image.

> **Independent claim 15**: A matrix display controller for controlling the energization of plural rows and plural columns in a **matrix display** to render a demanded image on the display, comprising [...].

'588, 22:13-16, 45-50;  24:4-9; 23: 11-14.  Plaintiff argues that the term is readily understandable from the claim language and does not require construction.  Defendants contend that the term should be construed as "matrix of liquid crystal pixel elements in which the gray level of a pixel element is not affected by the polarity (positive or negative) of the drive signal."

Defendants' proposed construction raises the central dispute between the parties about whether the invention covers all matrix displays or is limited to LCDs.  Defendants argue that "display terms in the asserted claims should be construed as claiming a liquid crystal display because the alleged 'invention,' as described by the inventor, is limited to controlling a liquid crystal display, and the patents use the word 'display' as a shorthand reference for liquid crystal display throughout the specifications."  Defs.' Claim Constr. Br. at 3. Plaintiff argues that the invention refers to matrix displays generally, and uses LCDs only as examples.  Plaintiff points to the common abstract of the patents, which  indicates the inventor's intent to cover a class of displays that is broader than LCDs alone: "This invention relates to an improved drive and control means for matrix addressable electro-optic displays, *such as* passive matrix LCDs and active matrix LCDs."  '457 patent (Abstract) (emphasis added).

United States District Court
For the Northern District of California

In order to disavow claim scope, the specification must contain "expressions of manifest exclusion or restriction." *Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1335 (Fed. Cir. 2009). The Court finds that no such explicit restrictions to LCDs are present in the patents-in-suit. The focus of the invention is on the circuitry and display drivers that process the demanded images with respect to the currently displayed images. The consideration of the type of output display is secondary, and is not limited specifically to LCDs. It is true that LCDs form the example throughout the common specifications. However, it is also true that the patents repeatedly refer to LCDs as a subset of matrix displays: "It is well known that matrix displays *such as* liquid crystal displays, both passive matrix and active matrix varieties, are composed of two planes (usually clear glass or plastic) having a multitude of conductive electrodes which sandwich a film of electro-optic material, *such as* liquid crystal material." '457 Patent, 1:10-15 (emphasis added). This language does not expressly disavow the use of other electro-optic materials. *See e.g., Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed.Cir.2002) (holding that even when the specification describes only a single embodiment, the claims will not be read restrictively unless the patentee has demonstrated a clear intent to limit claim scope using "words or expressions of manifest exclusion or restriction.").

Defendants rely on the fact that "[a]ll eight figures in the patents pertain only to liquid crystal displays." However, the specification expressly states that Figure 1 "is a block diagram *illustrating an embodiment* of the present invention." (emphasis added). '457 Patent, 12:67-68. The Federal Circuit has consistently advised against limiting claims to preferred embodiments in the figures. *See Playtex, Inc. v. Proctor & Gamble Co.*, 400 F.3d 901, 907 (Fed. Cir. 2005) ("By its reliance on the figures, the district court improperly limited claim 1 to a preferred embodiment."). Further, Figures 2-4 illustrate properties of liquid crystals and LCD displays without any reference to the invention, while Figures 5-8 illustrate aspects of the present invention that are not clearly limited to LCDs. *See* '457 Patent, 13:1-24.[4]

---

[4]As plaintiff points out, "Figures 5A, 5B, and 5C illustrate the concepts of different exemplar modulation schemes. There is nothing about these modulation schemes that is inherently limited to LCDs. Similarly, Figure 7 illustrates a logic flow that is not limited to LCDs. Defendants erroneously assert that because Figure 7 illustrates optional steps applicable to RMS [root mean squared] displays, that all displays other than LCDs are excluded. However, LCDs are not the only type of RMS displays. EPDs, for example, are also RMS displays." Pl. Reply Br. at 4.

United States District Court
For the Northern District of California

In *Liebel-Flarsheim Co. v. Medrad, Inc.* (Fed. Cir. 2002), the Federal Circuit reversed a district court construction that imported a requirement of a pressure jacket into a syringe design from the embodiments when no asserted claims recited such a limitation, stating that "this court has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Id.* at 907.  Defendants' proposed construction improperly seeks to import a limitation based only on its use as the common example.

Moreover, the doctrine of claim differentiation supports  plaintiff's view that the scope of the invention is not expressly limited to LCD displays.  In claim 1 of the '457 Patent, the patentee claims: "1. In combination, display means formed from a plurality of elements each constructed to provide for the display of an image in accordance with the introduction of signals to such element …." Claim 2 then claims, "2. In a combination as set forth in claim 1, the elements constituting liquid crystal displays." '457 Patent, 23: 24-25. This claim structure would be redundant if claim 1 were already limited to elements constituting LCDs.  Where an independent claim in a patent does not contain a limitation that is included in a subsequent dependent claim, "that limitation cannot be read into the former claim." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1325-26 (Fed. Cir. 2003) ("[t]here is a rebuttable presumption that different claims are of different scope" and that "courts must take extreme care when ascertaining the proper scope of the claims, lest they simultaneously import into the claims limitations that were unintended by the patentee"); *see also Voda v. Cordis Corp.*, 536 F.3d 1311, 1320 (Fed. Cir. 2008); *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1326 (Fed. Cir. 2008) ("While no mention of uniformity appears in independent claim 1, the uniformity criterion defined in the specification . . . is set forth in dependent claim 4.  It therefore appears that the uniformity requirement, as set forth in the specification, was intended to be added by dependent claim 4, and was not already present in independent claim 1 or the invention overall.").

Recently, the Federal Circuit has reaffirmed that it is "not enough that the only embodiments, or all of the embodiments, contain a particular limitation. We do not read limitations from the specification into claims; we do not redefine words. Only the patentee can do that. To constitute disclaimer, there must be a clear and unmistakable disclaimer . . . The patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly

redefines the term or disavows its full scope." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012) ("The task of determining the degree[s] . . . is part of the infringement analysis, not part of the claim construction."). Here, it is not enough that the figures and embodiments of the patents-in-suit contain the particular limitation of using LCDs as the output device for the drive signals. There is no "clear and unmistakable disclaimer"; instead, there is the illustrative language ("displays *such as* passive matrix LCDs") and claim differentiation suggesting the inventor considered LCDs a subset of possible output display devices.

The latter part of defendants' construction of "matrix display" – that the gray level of the pixels is "not affected by the polarity (positive or negative) of the drive signal" – is part of defendants' broader argument that the invention is limited to LCDs. Defendants assert that one characteristic of LCD pixels is that their gray levels respond equivalently to both positive and negative voltage signals – a trait the defendants deem "polarity independence."[6] This characteristic is useful to the invention because the drive circuitry can change the signal polarities without affecting the gray level. By alternating polarities, the invention can avoid other display problems, such as DC bias, a concern the patents seek to address. *See* '457, 1:44-60. Defendants' argument, however, carries the same defect as their general attempt to limit the output display devices to LCDs. While the preferred embodiments take advantage of this polarity-independent characteristic of LCD pixels, there is no "clear intention to limit claim scope" to displays whose gray levels are unaffected by polarity. *See Decisioning.com, Inc.*, 527 F.3d at 1314. To the contrary, the specifications contemplate the use of ferroelectric LCDs, a type of LCD that defendant's expert agrees is polarity-dependent. *See* '457, 20:55-65; Drabik Decl., at ¶ 61. It would therefore be improper to limit the term "matrix displays" to displays with gray levels that are unaffected by polarity.

Finally, the plain and ordinary meaning of "matrix display" is not limited to LCDs. *See* Mehrbrains Decl., ¶ 29 ("A matrix display relies upon an array of pixels whose light-affecting behavior is changed by the interaction between an electrically excited column electrode with an electrically

---

[6] EPDs, on the other hand, have white pigments that are attracted to negative voltages and black pigments attracted to positive voltages, and therefore are "polarity dependent." *See* Markman Tutorial Presentation, at 20.

excited row electrode."). Defendants' expert, Dr. Drabik, agrees that matrix displays generally include more than LCDs: "[b]y contrast to raster-scanned displays, a fixed-pixel, pixelated, or matrix display system, *such as* a liquid crystal display (LCD) or plasma display panel (PDP) . . . comprises an array of discrete, light-modulating or -emitting cells." Drabik Decl., Dkt. 273-1 ¶ 27 (emphasis added). Terms contained in claims are "generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005).

The Court therefore declines to adopt defendants' proposed construction of "matrix display." In order to provide greater clarity for the jury, the Court construes the meaning of "matrix display" from the description used in the patent. The Federal Circuit has held that the "construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Phillips*, 415 F.3d at 1316. The Circuit has also stated that "the patentee may choose to be his own lexicographer" when he explicitly defines a term in the patent. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The common specification defines a matrix display as follows:

> It is well known that matrix displays such as liquid crystal displays, both passive matrix and active matrix varieties, are composed of two planes (usually clear glass or plastic) having a multitude of conductive electrodes which sandwich a film of electro-optic material, such as liquid crystal material. Each point of intersection of the conductive electrodes between the front and back planes forms the site of a picture element (pixel).

'457 Patent, 1:15-20. This definition is consistent with defendants' expert's description of matrix displays as well. *See* Drabik Decl., Dkt. 273-1 ¶ 27 (and figure). Borrowing from this description, the Court defines "Matrix Display" as follows:

> **Matrix display [device]** is defined as "a display composed of pixels located at intersections of rows and columns of conductive electrodes."

## 2.   Display Means

The term **display means** appears in independent claims 38 of the '457 patent and claim 10 of the '558 patent. *See* '457, 30:18-22; '558, 23:43-49. The context is as follows:

> **Independent claim 38:** In combination for use with **display means** formed from a plurality of elements each constructed to provide for the display of an image in accordance with the introduction of signals to such element,
> first means for providing signals representing the images to be provided from individual ones of the elements in the display means,

second means for storing the signals . . .

**Independent claim 10**:  In combination for use with **display means** formed from a plurality of elements each constructed to provide for the display of an image in accordance with the introduction of signals to such element . . .

'457, 30:18-22; '558, 23:43-49.  Defendants argue that the term is a means-plus-function term, where the structure is "passive or active-matrix LCD panel in which each pixel's gray level is not static but instead continually varies in intensity and with the level (but not polarity) of the voltage across the pixel as described at FIGS 1-4, 6; 2:52-67, 3:49-59, 13:25-37, 17:54-67, 1:65-22:2" and the function is to "display a gray level at each pixel according to the voltage level applied across the liquid crystal film in the pixel."  Plaintiff argues that the term is not a means-plus-function term, and should be defined as "matrix display."

Means-plus-function terms are governed by 35 U.S.C. § 112, ¶ 6:

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

The burden of proof that a disputed claim is subject to § 112 rests with the party asserting the means-plus-function construction. *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1372 (Fed. Cir. 2003).  While the use of the word "means" creates a presumption of a means-plus-function term, it is not by itself sufficient. *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1347 (Fed.Cir. 2002) ("mere use of the word 'means' after a limitation, without more, does not suffice to make that limitation a means-plus-function limitation.").  The presumption is rebutted if the claim recites sufficient structure to perform the claimed function. *Id.*; *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 531 (Fed. Cir. 1996).

Plaintiff contends that the term should not be construed as a means-plus-function term because the claim language does not specify a function, but provides sufficient structure with the words directly following the term: "a plurality of elements [pixels] each constructed to provide for the display of an image in accordance with the introduction of signals to such element."  The Court agrees.  The "elements each constructed to provide for the display of an image in accordance with the introduction of signals to such element" describes sufficient structure to overcome the "means" presumption.

In *Touchcom, Inc. v. Berreskin & Parr*, 2010 WL 3198902 (E.D. Va. Aug. 11, 2010), the court

11

United States District Court
For the Northern District of California

interpreted "display and input means" as a means-plus-function term when any display type could be used to display information in an interactive pump station, and "nothing in the phrase 'display and input,' describes sufficient structure to overcome the presumption." *Id.* at \*5. *See also Better Educ., Inc. v. EInstruction Corp.*, 2010 WL 1711254 (E.D. Tex. Apr. 27, 2010) (finding insufficient structure to overcome the presumption in the language "electronic display means for displaying information, by the teacher to the students.").   Here, however, the language of the claim at issue is substantially more specific and directed at structure.   The claim term does not cover every means of displaying or every display.   A "plurality of elements each constructed to provide for the display of an image in accordance with the introduction of signals to such element" describes a display composed of individual pixels that respond to electrical signals, which is the structure of a matrix display.   This is sufficient structure to defeat the presumption that the term is in means plus function format.[2]

Defendants are mistaken in their argument that the word "display" is used to indicate a function rather than structure in the claims.   Defendants argue that "the term 'display means' is coupled in the claim with the following use of the same word, 'display,' as a verb: 'to provide for the display of an image.'"   Defs.' Claim Constr. Br. at 6.   But as the definite article "the" indicates, "display" is consistently used as a noun in the language cited by the defendants, and it is used in the context of describing structure.   Defendants argue for a construction that, like "matrix display" discussed *supra*, imports LCD limitations into the term.   For the same reasons the Court already discussed with respect to "matrix display," it is unnecessary to import those limitations.

The Court agrees with plaintiffs that "display means" refers to the "matrix display," and will define it accordingly:

> **Display means** is defined as "matrix display, meaning a display composed of pixels located at intersections of rows and columns of conductive electrodes."

---

[2] Several courts have also construed "display means" to rebut the means-plus-function presumption. *See Nonin Med., Inc. v. BCI, Inc.*, 2004 WL 442894 (D. Minn. Mar. 8, 2004) ("The Court here agrees with Nonin that the word 'display' as used in the '052 Patent is a structural term. The OED includes a noun definition of 'display' as 'a visual presentation of data from a computer,' and that is the sense in which the '052 Patent uses the term 'display [means]'"). See also *Optimal Recreation Solutions, LLP v. Leading Edge Techs., Inc.*, 6 Fed. App'x. 873, 878 (Fed. Cir. 2001) (reversing district court construction of "display means" as a means plus function element, with no reasoning given).

**United States District Court**
For the Northern District of California

**3.      Matrix Display Controller / Controller for Rendering a Demanded Image on a Matrix Display Device**

The term **matrix display controller** appears in independent claim 15, while the term **controller for rendering a demanded image on a matrix display device** appears in the independent claim 23 of the '588 patent. *See* '588, 23:11-24; 24:4-10. The context is as follows:

> **Independent claim 15**:  A **matrix display controller** for controlling the energization of plural rows and plural columns in a matrix display to render a demanded image on the display, comprising: logic means for processing data representative of the demanded image and storing processed data in electronic memory; and logic means for generating row and column drive signals based on the processed data; and logic means for selectively sending the row and column drive signals to the rows and columns, respectively, wherein the logic means for sending can send at least two of the drive signals simultaneously

> **Independent claim 23**:  A **controller for rendering a demanded image on a matrix display device** including plural rows and plural columns, the rows and columns being energized by respective drive circuitry, the drive circuitry being configured such that both the columns and the rows can be energized to one of a plurality of states in response to the demanded image.

'588, 23:11-24; 24:4-10.  Plaintiff argues that the disputed terms are non-limiting preamble terms. Plaintiff contends that these terms are readily understandable in the context of the claim language and do not require construction, or else should be construed as "plain and ordinary meaning of: electronics and programming that makes image signals from a graphic or video source understandable to a matrix display."  Defendants contend that the term should be construed  as a "device that provides row and column drive signals that do not change polarity in a predetermined and periodic fashion to effect an image's display on an LCD. This excludes controllers using 'alternating'" drive signals such as those described in Bennett USP 5,034,736 at Fig. 4 and 8:16-57."

Defendants' proposed construction – a "device that provides row and column drive signals that do not change polarity . . ." – is essentially an attempt to limit the definition of "row and column drive signals," another disputed term that the Court discusses next.  Whether or not the Court adopts

13

United States District Court
For the Northern District of California

Defendants' proposed limitations for the drive signals, it is unnecessary to do so with respect to the device controlling them.  Moreover, a preamble is not limiting "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com*, Inc., 289 F.3d 801, 808 (Fed. Cir. 2002) (citing *Rowe v. Dror*, 112 F.3d 473, 478, 42 USPQ2d 1550, 1553 (Fed.Cir.1997)).  In claims 15 and 23, the general term "controller" is introduced for the purpose of describing its structure in the limitations following the preamble.  These limitations include the description of logic means for generating drive signals based on the comparison of the simulation of the currently displayed image and the demanded image, while the nature of drive signals and the method for selectively sending signals are defined separately below.

The Institute of Electrical and Electronics Engineering defines "display controller" broadly as "a processing unit that will produce the corresponding image on the display device when presented with a display instruction." *The Authoritative Dictionary of IEEE Standard Terms* (7th ed. 2000).[7]  This definition is consistent with plaintiff's definition.  Therefore, the Court adopts plaintiff's definition:

> **Matrix Display Controller / Controller For Rendering A Demanded Image On A Matrix Display Device** is defined as "plain and ordinary meaning of: electronics and programming that makes image signals from a graphic or video source understandable to a matrix display."

**4.      Row and Column Drive Signals**

The term **row and column drive signals** appears in independent claims 1 and 15 of the '588 patent. *See* '588, 23:11-24; 24:4-10. The context is as follows:

---

[7] "Dictionaries and technical treatises, which are extrinsic evidence, hold a special place and may sometimes be considered along with the intrinsic evidence when determining the ordinary meaning of claim terms." *Bell Atl. Network Services, Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001)

**Independent claim 1**. A method for rendering a demanded image on a matrix display device including a plurality of rows and a plurality of columns, comprising the steps of:  processing data representative of the demanded image; generating **row and column drive signals** based on the processed data; and selectively sending the row and column drive signals to the rows and columns respectively, wherein at least two of the drive signals can be sent simultaneously to their respective rows or columns.

**Independent claim 15**. A matrix display controller for controlling the energization of plural rows and plural columns in a matrix display to render a demanded image on the display, comprising: logic means for processing data representative of the demanded image and storing processed data in electronic memory;  and logic means for generating **row and column drive signals** based on the processed data; and logic means for selectively sending the row and column drive signals to the rows and columns, respectively, wherein the logic means for sending can send at least two of the drive signals simultaneously.

'588 Patent, 22: 14-23; 23: 11-24.  Plaintiff contends this term should be construed as "voltages applied to the electrodes of the matrix display."  Defendants contend that the term should be construed as "voltages applied to the electrodes of the matrix display that do not change polarity in a predetermined and periodic fashion, excluding alternating drive signals such as those described in Bennett USP 5,034,736 at Fig. 4 and 8:16-57."

Defendants argue that the specification "describes two types of drive signals: (1) the DC drive signals repeatedly described as important to the 'present invention' and (2) 'prior-art' drive signals that 'are alternately subjected to equal and opposite polarities of electrical bias on a continuous basis at a fixed frequency (AC drive).'" Def.'s Br. at 11 (citing '457 Patent at 1:22-43).[8]  Defendants argue that where, as here, "a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined the term by implication." *Id. (citing Bell Atl.*

---

[8] DC, or direct current, is "an electric current that flows in one direction," while AC, or alternating current, is "an electric current that reverses direction at regularly recurring intervals of time." *The Authoritative Dictionary of IEEE Standard Terms* (7th ed. 2000).

15

United States District Court
For the Northern District of California

*Network Servs. v. Covad Commc'ns. Group*, 262 F.3d 1258, 1271 (Fed. Cir. 2001).[1]  Defendants further argue that AC signals are excluded from the patents' claim scope, citing the following language from the common specifications:

> "The present invention . . . eliminates the burden of frequent and symmetrical reversals of the drive polarity" ('457 Patent at Abstract); "[w]ith the present invention, when the display controller receives a request to update the display, the controller does not need to delay until the current display frame cycle is completed, as is required by prior art display drive systems" ('457 Patent at 1:61-66); "the present invention operates LCDs as DC voltage integrating devices" ('457 Patent at 5:55-57); "[u]se of these concepts allows the drive signals to maintain a given DC polarity for a much greater duration than is maintained in prior art" ('457 Patent at 8:46-48); and "[a]ll the new drive techniques taught employ DC bias violation memory and bias reconciliation means. These drive schemes also differ from prior art in that they do not require frequent complementary reversals of drive polarity."

Def.'s Br. at 13 (citing '457 Patent at 9:61-63.).  Defendants also point to the prosecution history of the '457 Patent, citing the Nov. 3, 1994, Letter to Examiner, J. Brier, at 7, which states: "Claim 89 is allowable over Bennett because of the recitation of second means for applying direct voltages to a plurality of elements in display means . . . Bennett does not provide a direct voltage to the electrodes in his display . . . [T]he drive signals in Bennett are alternating."  *See Rhodia Chimie v. PPG Indus. Inc.*, 402 F.3d 1371, 1384 (Fed.Cir.2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution.").

The Court agrees that the signals described by the patents-in-suit are DC signals.  The patents distinguish prior art displays that used AC drive frequencies, which the patents complain had "lower display contrasts, narrower viewing angles and use power less efficiently." *Id.*, 1:35-39.  One of the key innovations of the patents is the ability of the patents to "track" the accumulated DC bias on the pixels

---

[1] In *Covad*, the Federal Circuit upheld a district court construction of the term "plurality of modes" to mean one of the three modes identified in the specification. The Court acknowledged that "it is generally impermissible to limit claim terms by a preferred embodiment or inferences drawn from the description of a preferred embodiment,"however, in that case, the patentee had explicitly defined the meaning of the word "mode" and the case did not involve a "[v]aried use of a disputed term." *Id.* at 1273.

and neutralize its destructive effects. *See* '457 Patent, 2:1-15. The specification states that "*all* the new drive techniques taught employ DC bias violation memory and bias reconciliation means." *Id.*, 9:61-63. It should also be noted that the title of the patents is "DC Integrating Display Driver Employing Pixel Status Memories." The Federal Circuit has held that, "[w]here the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *Honeywell Int'l, Inc. v. ITT Indus, Inc.*, 452 F.3d 1312, 1319 (Fed. Cir. 2006). Here, the invention is premised on the use of DC signals. Unlike the type of output display, a secondary consideration for the patents, the use of DC signals goes to the heart of the invented circuitry, and the Court will construe row and column drive signals as limited to DC drive signals.

The Court disagrees with defendants, however, that the term should be construed as voltages that "do not change polarity in a predetermined and periodic fashion." This construction is broader and more ambiguous than the terms DC and AC drive, because the directional changes of the signals may be "predetermined" in other respects. For these reasons, the Court adopts the following definition:

> **Row and Column Drive Signals** are defined as **"**DC voltages applied to the electrodes of the matrix display."

**5.      Selectively Sending the Row and Column Drive Signals to the Rows and Columns Respectively/Selectively Addressable Rows and Columns**

The term **selectively sending the row and column drive signals to the rows and columns respectively** appears in independent claims 1 and 15 of the '588 patent. *See* '588, 23:11-24; 24:4-10. The term **selectively addressable rows and columns** appears in the dependent claim 22 of the '588 patent. *See* '588, 23:11-24. The context is as follows:

**Independent claim 1.** A method for rendering a demanded image on a matrix display device including a plurality of rows and a plurality of columns, comprising the steps of: processing data representative of the demanded image; generating row and column drive signals based on the processed data; and **selectively sending the row and column drive signals to the rows and columns respectively**, wherein at least two of the drive signals can be sent simultaneously to their respective rows or columns.

**Independent claim 15**: logic means for **selectively sending the row and column drive signals to the rows and columns, respectively**, wherein the logic means for sending can send at least two of the drive signals simultaneously.

**Dependent claim 22**: The controller of claim 15, in combination with the display such that the display has **selectively addressable rows and columns.**

'588 Patent, 22: 14-15, 23: 11-25, 24: 1-3.  Plaintiff contends this term should be construed as "rows and columns that can be addressed in one of a plurality of row and column combinations."  Defendants argue that the term should be construed as "[addressing the rows and columns/ the rows and columns are addressed] in a manner and order that is image-dependent, such that the rows and columns are not driven in a predetermined sequence."

Plaintiff agrees that rows and columns *can* be selected in an image-dependent manner, but do not believe that function is mandatory.  Pl.'s Claim Constr. Br. at 12.  The specification states, however: "The present invention allows pixels to be driven selectively and in any sequence (e.g. synchronous, asynchronous, multiple backplanes selected, skipped backplanes).  The order in which the pixels are driven is determined by underlying principles of this invention." '588 Patent at 5:33-38.  The underlying principles referred to are the computed "difference between the present state of the display and the most recent demanded image.  The order and manner in which drive signals are applied is continually recomputed based on these considerations." *Id.*  The specification describes the purpose and nature of the selection process in detail:

In prior art, the display controller does not look at the new demanded image until it has completed drawing the present frame set. (In some instances, this can result in an image being skipped if another demanded image comes in from the host before

the display's update frame cycles have been completed.) Thus, in prior art, there is a latency period (the time of the full frame cycle) which must elapse before the display can begin to show a new demanded image. In the present invention the concept of fixed frame cycles is eliminated. The system looks at the most recent demanded image in its entirety and compares it to what is presently on the display (or more specifically, to the simulation of what is on the display) and generates an optimal or near-optimal drive sequence to make the display substantially conform as quickly as possible to the new demanded image. With this technique, latency periods between display updates are minimized and skipped images are eliminated. The controller continually compares the most recent demanded image to the condition of the display and determines a drive sequence to make the display look like the demanded image.

'588 Patent at 7:39-57.

Plaintiff's proposed definition does not address the innovative function of selecting a near-optimal drive sequence. Indeed, in plaintiff's proposal, the word "selectively" is doing no work at all. Given the innovative significance of the selection process, **selectively sending the row and column drive signals to the rows and columns respectively** is defined as

"[addressing the rows and columns / the rows and columns are addressed] in a manner and order that is determined based on the comparison of the most recent demanded image with the current image and condition of the display."

Claim 22, however, does not speak to the sending function of the controller, but to the receptive function of the display: "display has selectively addressable rows and columns." '588 Patent, 24: 1-3. The fact that the rows and columns are "selectively addressable" does not define inherent characteristics of the rows and columns, and thus it need not be included in the definition. Therefore, **selectively addressable rows and columns** is defined in accordance with its plain meaning as:

"rows and columns that can be addressed in one of a plurality of row and column combinations."

## 6.    Both the Columns and the Rows Can Be Energized to One of a Plurality of States

The phrase **both the columns and the rows can be energized to one of a plurality of states** appears in independent claims 8 and 23 of the ' 588 patent. *See*, '588, 22:45-49, 24:4-9. The context

19

is as follows:

> **Independent claim 8**:  A method for rendering a demanded image on a matrix display device including plural rows and plural columns, the rows and columns being energized by respective drive circuitry, the drive circuitry being configured such that **both the columns and the rows can be energized to one of a plurality of states** in response to the demanded image.

> **Independent claim 23**:  A controller for rendering a demanded image on a matrix display device including plural rows and plural columns, the rows and columns being energized by respective drive circuitry, the drive circuitry being configured such that **both the columns and the rows can be energized to one of a plurality of states** in response to the demanded image.

'588, 22:45-49, 24:4-9.  Plaintiff argues that the term means "both the columns and rows can have their electrical conditions modified to occupy one of a plurality of non-zero states."  Defendants contend that the phrase means "both the row electrodes and column electrodes are configured to receive two or more distinct non-zero voltage drive signals, in a manner and order that is image-dependent, such that the rows and columns are not driven in a predetermined sequence."

The major difference in the constructions is that defendants seek to import the limitation that the electrodes receive signals "in a manner and order that is image dependent, such that the rows and columns are not driven in a predetermined sequence."  In other words, defendants focus on the manner in which the signals are sent (i.e., driven).  However, the phrase at issue relates to how the rows and columns respond to *receiving* the signals: they are "energized."  Whether the rows and columns were addressed in a manner that was "image dependent" or "image independent" makes no difference to the rows and columns; in either event, they become energized.  Defendants are simply seeking to import the same limitations of image dependence argued for with respect to the term "selectively sending the row and column drive signals."  The Court has already partially agreed with their construction of that term.  The Court sees no reason to also import that limitation here.

The parties also dispute what happens to the electrodes.  Plaintiffs state that "energized" means

to have "electrical conditions modified" and that the "plurality of states" is a "plurality of non-zero states."  Defendants argue that simply stating the electrodes are "modified" improperly broadens the claim language, and that plaintiff's construction ignores that the electrodes are configured to receive zero voltage drive signals.  Instead, defendants argue that the "row electrodes and the column electrodes are configured to receive two or more distinct non-zero voltage drive signals, as well as zero voltage drive signals."  The defendants suggest "voltage drive signal" provides additional clarity.

Plaintiffs do not dispute that *what* energizes the electrodes are voltage drive signals, nor that the electrodes may receive a zero voltage drive signal.  *See* '588, 15:52-61 (in the preferred embodiment, "Bits which were set to one will have their corresponding electrode driven to high voltage, and bits which were set to zero will have their corresponding electrode set to low voltage.  For the purpose of this embodiment, low voltage is zero volts . . .").  Inasmuch as including the phrase "voltage drive signals" may provide clarity for the jury, the Court includes them in its definition.  However, the phrase already states that the columns or rows "can" be energized, meaning it already contemplates a zero or non-zero state; including extra language will be superfluous and overly confusing.  The Court will not include the "zero" and "non-zero state" language.

> **Both the columns and rows can be energized to one of a plurality of states** is defined as "both the column electrodes and row electrodes can be energized by voltage drive signals to one of a plurality of states."

## 7.     Data Representative of the Demanded Image is Analyzed with Respect to a Currently Displayed Image

The phrase **data representative of the demanded image is analyzed with respect to a currently displayed image** appears in dependent claims 2, 9, 16, and 24 of the '588 Patent.  The context is as follows:

21

**Dependent claim 2:** The method of claim 1, wherein the **data representative of the demanded image is analyzed with respect to a currently displayed image** prior to the generating step.

**Dependent claim 9:** The method of claim 8, wherein **data representative of the demanded image is analyzed with respect to a currently displayed image** prior to energizing the rows and columns to display the demanded image.

**Dependent claim 16:** The controller of claim 15, wherein the **data representative of the demanded image is analyzed with respect to a currently displayed image** prior to the generating step.

**Dependent claim 24:** The controller of claim 23, wherein **data representative of the demanded image is analyzed with respect to a currently displayed image** prior to energizing the rows and columns to display the demanded image.

'588 Patent, 22:24-26, 22:51-54, 23:24-27, 24:11-14.  Plaintiff argues that the phrase means, "for each pixel, a numeric difference of the demanded image and data representative of a currently displayed image is determined."  Defendant contends the phrase means, "for each pixel, the numeric difference between the demanded image array and the simulated current image is calculated."

The key difference between the two constructions is whether the differences between the current image and the new, demanded image are "determined" or "calculated."  Defendants argue for "calculated," a narrower term than "determined."  Defendants argue that the specifications of the patents-in-suit characterize the difference-determination as solely involving "computation" or "calculation."  The Court disagrees.  The specifications state that:

> The MCU 12 *determines* a numeric difference between the corresponding values in memory by using known techniques such as *comparison*, *arithmetic*, and *logical operation*.  These *computed* values represent the difference between the current gray level of each pixel on the LCD 10 and the demanded gray level of each pixel.

'588 Patent, 15:6-11; '457 Patent, 15:54-60; '558 Patent, 15:8-13 (emphasis added).  The specifications not only use the word determine, but give a number of examples as to how that determination is made. The specifications therefore contemplate more determination methods than calculation. "Determination" is the correct construction.

The parties agree that use of the phrase "numeric difference" should be added to the definition, and the Court agrees as well. Plaintiffs describe the numeric difference between the "demanded image" and "data representative of a currently displayed image," while defendants describe the difference between the "demanded image array" and the "simulated current image." Both are correct; the Court will use the simplest, most accurate possible terms to convey the meaning of the phrase. The "demanded image" and the "simulated current image" provide the most clarity.

> **Data representative of the demanded image is analyzed with respect to a currently displayed image** means "For each pixel, the numeric difference between the demanded image and the simulated current image is determined."

8.   **Third means for providing, for the individual elements in the display means, signals representing the difference between the signals from the second and first means for such individual elements**

The phrase **third means for providing, for the individual elements in the display means, signals representing the difference between the signals from the second and first means for such individual elements** appears in independent claim 10 of the '558 Patent. The context is as follows:

> **Independent Claim 10**: In combination for use with display means formed from a plurality of elements each constructed to provide for the display of an image in accordance with the introduction of signals to each element,
>     first means for providing signals representing the images to be demanded from individual elements in the display means,
>     second means for storing signals representing the images provided from the individual elements in the display means,
>     **third means for providing, for the individual elements in the display means, signals representing the difference between the signals from the second and first means for such individual elements,**
>     fourth means for changing the images from the individual elements in the display means in accordance with the signals from the third means for individual elements.

'558 Patent, 23:43-60. The parties agree that the phrase is a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6. Plaintiff argues that the structure recited is "a microcontroller programmed to provide for the individual pixels, signals that numerically represent the difference between the signals from the

**United States District Court**
For the Northern District of California

second means (i.e., RAM) and the first means (i.e., video RAM) (see e.g., MCU 12)" and the function is "providing signals that numerically represent a difference between the signals from the second means (i.e., RAM) and the first means (i.e., video RAM) for the individual pixels."  Defendants argue that the structure is, "MCU 12 programmed to compute the numeric difference between the stored byte values respectively representing the two signals, the demanded image array stored in VRAM and the simulated image array stored in a block of memory in RAM 16, byte by byte as depicted in Fig. 7 and store the results in the difference array in a block of memory in RAM 16, as described at FIGS. 1, 7, 15:47-16:2, 18:18-24, 19:49-53," and the function is, "compute the byte-by-byte numeric difference of the demanded image array in RAM and store the results in the difference array in RAM."

The central dispute again focuses on whether the invention "computes" differences or, here, "provides" differences.  The structure at issue determines the difference between the simulated, current image stored in the RAM (the second means) and the new, demanded image, stored in the VRAM (the first means).  The structure, whether it is a "microcontroller" generally, as plaintiff offers, or the MCU 12 identified in the diagrams, determines the difference.

The Court again finds that there is no reason to import the limitation of "compute" into the claim terms.  As noted with the preceding term, the specification says that the "MCU 12 *determines* a numeric difference between the corresponding values in memory by using known techniques such as comparison, arithmetic, and logical operation."  *See, e.g.,* '588, 15:6-9.  The claim itself uses the term "third means for *providing* . . . signals representing the difference."  '588 Patent, 23:53-54.  The claim language is the starting point for the analysis, as "the claims measure the invention."  *Cont'l Paper Bag Co. v. E. Paper Bag Co.*, 210 U.S. 405, 419 (1908); *see also Philips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) ("[I]f we once begin to include elements not mentioned in the claim, in order to limit such claim, we should never know when to stop.") (*citing McCarty v. Lehigh Valley R.R. Co.*,

160 U.S. 110, 116 (1895)).   Here, the term "provides . . . signals representing the difference" encompasses the provision of the signals, not the separate and distinct action of determining the difference.   The Court finds no reason to import that action into the limitation, much less restrict it to the word "computation."

Defendants also seek to import into the definition of the structure the fact that the results of the difference determination are stored in a difference array in a block of memory in the RAM.   It is true that the differences are so stored, but there is no reason to import that fact into the structure of the term at issue.   The "third means" at issue focuses on the provision of the signals, not the antecedent process of storing the difference.

The Court will add clarity to the "first means" and "second means" language, because throughout the patents, the first means refers to the demanded image in the VRAM and the second means refers to the simulated, current image in the RAM.

> **Third means for providing, for the individual elements in the display means, signal representing the difference between the signals from the second and first means for such individual elements** describes the following:
>
> > Structure: A microcontroller programmed to provide for the individual pixels signals that represent the difference between the signals from the current image (in the RAM) and the demanded image (in the VRAM) (see, e.g., MCU 12).
> >
> > Function: Providing signals representing the difference between the signals from the current image (in the RAM) and the demanded image (in the VRAM).

9.   **Third means responsive to the signals from the first and second means from the individual ones of the elements in the display means for providing signals representing the differences between the signals from the first and second means for such individual ones of the elements in the display means**

This term is found in independent claim 38 of the '457 Patent, and is essentially the same term as the one just discussed, claim 10 of the '558 Patent.   The difference is that this term refers to plural

"differences" while the "third means" of claim 10 refers to the singular "difference."  Defendants seek the same definitions for structure and function as they did with the prior term; plaintiffs seek to pluralize the word "differences."  Because the phrase refers to "differences," the Court finds it reasonable that the structure and function would refer to differences as well.

> **Third means responsive to the signals from the first and second means from the individual ones of the elements in the display means for providing signals representing the differences between the signals from the first and second means for such individual ones of the elements in the display means** describes the following:
>
> > Structure: A microcontroller programmed to provide for the individual pixels signals that represent the differences between the signals from the current image (in the RAM) and the demanded image (in the VRAM) (see, e.g., MCU 12).
> >
> > Function: Providing signals representing the differences between the signals from the current image (in the RAM) and the demanded image (in the VRAM).

**10.**     **Fourth means for changing the images from the individual elements in the display means in accordance with the signals from the third means for such individual elements**

The phrase **fourth means for changing the images from the individual elements in the display means in accordance with the signals from the third means for such individual elements** also appears in claim 10 of the '558 Patent.  Again, that claim is the following:

> **Independent Claim 10**:  In combination for use with display means formed from a plurality of elements each constructed to provide for the display of an image in accordance with the introduction of signals to each element,
>
> > first means for providing signals representing the images to be demanded from individual elements in the display means,
> > second means for storing signals representing the images provided from the individual elements in the display means,
> > third means for providing, for the individual elements in the display means, signals representing the difference between the signals from the second and first means for such individual elements,
> > **fourth means for changing the images from the individual elements in the display means in accordance with the signals from the third means for such individual elements.**

'558 Patent, 23:57-60.  The parties agree that the term is a means plus function limitation under 35

**United States District Court**
For the Northern District of California

26

1   U.S.C. § 112, ¶ 6.  Plaintiff argues that the structure recited is "row and column drivers (*see e.g.,* row

2   and column drivers 24 and 26)" and the function is "changing the images from the individual pixels in

3   accordance with the signals from the third means (i.e., programmed microcontroller) for such individual

4   pixels."  Defendants argue that the structure is, "MCU 12 including queued serial interface (QSI) and

5   time processor unit (TPU), RAM 16, row and column drivers HV04 configured to drive row and column

6   electrodes both selectively and simultaneously using drive signals that do not change polarity in a

7   predetermined and periodic fashion, LCD 10, as described at FIG. 1, 8:11-14, 15:29-46, 16:3-46, 1:22-

8   68, 3:1-6, 3:32-48, 5:27-31, 5:40-6:53, 6:58-8:14, 8:15-19:23, 9:31-34, 9:54-67, 10:1-12:16" and the

9   function is "Beginning with difference array in RAM, realize a displayed image on the LCD, by

10  computing the drive signal and sending it by addressing the rows and columns in a manner and order

11  that is image-dependent, such that the rows and columns are not driven in a predetermined sequence,

12  and using drive signals that do not change polarity in a predetermined and periodic fashion.  This

13  excludes 'alternating' drive signals such as those described in Bennet USP 5,034,736 at Fig. 4 and 8:16-

14  57."

15      Plaintiff's proposal hews closely to the claim language, and essentially asserts that the "fourth

16  means" are the row and column drivers, which change the pixel images based on the signals from the

17  third means – the microcontroller described above.  Defendants' proposed term essentially argues that

18  the "fourth means" is the bulk of the invention, and thus they import all of the claim limitations sought

19  in all of the prior terms at issue.  Defendants argue that the structure is the same MCU 12 argued for in

20  the "third means," which sends signals only selectively, does not change polarity, is limited to LCDs,

21  and excludes alternating drive signals and the Bennett patent.  Defendants recognize that the Court's

22  construction of the prior terms – particularly the "third means . . ." and "row and column drive signals"

23  – will be dispositive of its construction of this term.  The Court has already rejected a number of the

limitations defendants seek to import here.

This leaves the broader question of whether the structure of the "fourth means" addresses only the "row and column drivers" – the final step for the drive signals in the display process on the way to the matrix display, as set forth in Fig.1 – or the bulk of the patented structure, including the MCU, algorithms, and necessary circuitry, as defendants contend.  Defendants argue that it would be improper to define the structure as the row and column drivers alone because they "cannot change images by themselves – they must receive image information from the MCU before they change the images." Def.'s Claim Const. at 22.

"The corresponding structure to a function set forth in a means-plus-function limitation must actually perform the recited function, not merely enable the pertinent structure to operate as intended." *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1371 (Fed. Cir. 2001).  The question is whether the row and column drivers are sufficient structure to serve the function of changing the images on the pixels.  The specification describes how the row and column drivers are responsive to the microcontroller (the third means):

> The MCU 12 communicates the drive patterns and signals to the row and column drivers 24 and 26 through the queued serial interface (QSI), which is an on-chip subsystem on the MCU 12, and through the function control lines. The sequence of actions required to communicate the drive signals to the row and column drivers 24 and 26, is as follows: The latch enable pin (LE) on the HV04s of the row and column drivers 24 and 26 is brought to a low logic state by means of outputting a low logic state on function pin 1. The binary data representing the drive signals are transmitted from the MCU 12 using the QSI and the on-chip time processor unit (TPU) of the MCU 12. The data are transmitted to the "data in" pin on the HV04 and are synchronized on the HV04's "clock" pin. The rate of data transmission in this embodiment is limited to a maximum of 8 MHz, a constraint imposed by the maximum throughput of the HCO4. During each clock period, one bit position is loaded and shifted into a 64 bit shift register which is on the HV04. (A plurality of HV04s may be employed without a need for additional control lines from the MCU 12. This is achieved by arranging the HV04s serially in such a manner that the "data out" pin of a preceding HV04 is connected to the "data in" pin of the succeeding HV04. )

'588 Patent, 15:21-43; '457 Patent, 16:3-27; '558 Patent, 15:23-45 (emphasis added).  Plaintiff's expert states that

> the drivers function to provide for increases in the gray level of images in some pixels (elements) and do so in response to signals from the third means (*i.e.*, the microcontroller). Recall that the microcontroller provides signals representing the differences between the signals from the first means and the signals from the second means. The drive scheme is generated by the microcontroller and the corresponding voltages are synthesized at the electrodes. (*See e.g.*, task 89 of Fig. 8 of the common specification).

Mehrbians Decl., ¶ 72.  According to plaintiff, the drivers are sufficient structure to change the display of the pixels.

Defendants argue that the row and column drivers cannot change images by themselves; "they must receive image information from the MCU before they can change the images."  Def.'s Claim Const. at 22.  This is true.  However, it is not necessary for the defined structure to include every antecedent step enabling the performance of its function.  *See Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1371 (Fed Cir. 2001) ("The corresponding structure to a function set forth in a means-plus-function limitation must actually perform the recited function, not merely enable the pertinent structure to operate as intended."); *see also Baxter Healthcare Corp. v. Fresenius Med. Care Holdings, Inc.*, 2009 U.S. Dist LEXIS 13842, at *20-21 (N.D. Cal. Feb. 10, 2009) (Hamilton, J.) (rejecting additional structure unnecessary to performance of claimed function: "Here, while the additional structure identified by Fresenius -- the valves (which work with the pump chambers), the valve actuators (which are also formed by the piston element and correspond to the valve stations much as the pump actuators correspond to the pump stations), and the pressure actuating networks (which distribute the fluid pressure from the air pump to the pump and valve actuators using tubing) – all enable the pumping mechanism to operate, they do not actually perform the claimed function of operating the pumping mechanism.").  Here, the row and column drivers are the final step, and actually provide the signals

processed in the microcontroller to the pixels.  457 Patent, 16:3-27 ("The MCU 12 communicates the drive patterns and signals to the row and column drivers . . . ").  They are the "fourth means."  It would be unnecessary and superfluous to describe the activity of the microcontroller in its structure.

Defendants also seek to import into the structure the specific queued serial interface (QSI) and time processor unit (TPU) described in the preferred embodiment.  These limitations are merely exemplary and need not be imported into the claim definition.  *See Khyber Techs Corp. v. Casio Inc.*, 2004 U.S. Dist. LEXIS 15714, *19-20 (D. Mass. Aug. 11, 2004) (the corresponding structure should not be limited to "particular features found in the exemplar microcontroller referred to" by the specification).   The Court defines the term as follows:

> **Fourth means for changing the images from the individual elements in the display means in accordance with the signals from the third means for such individual elements** describes the following:
>
> > Structure: row and column drivers (*see e.g.,* row and column drivers 24 and 26).
> >
> > Function: changing the images from the individual pixels in accordance with the signals from the third means (the programmed microcontroller) for such individual pixels.

**11.      Fourth means responsive to the signals from the third means for providing for increases in the gray levels of the images in first elements in the display means in accordance with differences of one polarity as represented by the signals from the third means for such first elements and for providing for decreases in the gray levels of the images in second elements in the display means in accordance with differences of an opposite polarity as represented by the signals from the third means for such second elements**

This term appears in claim 38 of the '457 patent.  It is similar to claim 10 of the '558 patent, with a particular focus on the polarity differences of the signals.  Plaintiff contends that the structure is the "row and column drivers (*see e.g.* row and column drivers 24 and 26)" and its function is "for providing for increases in the gray levels of the images in one group of pixels of the display in accordance with differences of one polarity as represented by the signals from the third means (i.e.,

programmed microcontroller) for that group of pixels and for providing for decreases in the gray levels of the images in another group of pixels of the display in accordance with differences of an opposite polarity as represented by the signals from the third means (i.e., programmed microcontroller) for that other group of pixels." Defendants argue the structure is "MCU 12 programmed to carry out block 66 of Figure 7, as described at 19:5-13. Said 'drive voltages' do not change polarity in a predetermined and periodic fashion. See also citations to intrinsic evidence for 'drive signals,'" and the function is to "effect changes in charges on pixels according to the difference array, addressing the rows and columns in a non-deterministic and image-dependent manner, such that the rows and columns are not driven in a predetermined sequence, and using drive signals that do not change polarity in a predetermined and periodic fashion. This excludes 'alternative' drive signals such as those described in Bennet USP 5,034,736 at Fig. 4 and 8:16-57." The citation referenced by defendants, describing block 66, states that

> These intensity requirements for the individual pixels are necessary for the next operation, which is 'generate drive pattern' (block 66). To generate the drive pattern, the MCU 12 must set up a sequence of drive voltages at the electrodes which produces the desired voltages at the individual pixels. The drive pattern is converted to a sequence of bit patterns which are stored in memory that, when loaded into the drive circuit (HV04), will synthesize the desired drive pattern.

'457 Patent, 19:5-13.

Plaintiffs again argue that the structure of the fourth means is the row and column drivers, while defendants argue that the fourth means is the MCU 12. The Court agrees with plaintiffs that the structure referenced in the term is the row and column drivers for many of the same reasons cited with respect to the "fourth means" in claim 10 of '558. The steps of the claim are essentially (1) the first means referring to the VRAM, which stores the demanded image; (2) the second means referring to the RAM, which stores the simulated current image; (3) the third means referring to the MCU 12, which determines the difference; and (4) the fourth means referring to the row and column drivers, which drive the signals to the pixels. It is the latter term referenced here.

As to the function of this term, defendants argue in their claim construction brief that "the parties appear to agree that the fourth means of claim 38 of the '457 Patent has the same meaning as fourth means of claim 10 of the '558 Patent," and merely incorporate their earlier arguments from that term. Confusingly, however, defendants provide different definitions for claim 38 and claim 10. In claim 38, defendants seek to incorporate various limitations previously rejected earlier in this order, and summarize the function as to "effect changes in the charges on pixels according to the difference array."

Plaintiff emphasizes the key role of polarity in effecting changes in the gray levels of the pixels, and adheres more closely to the language of the claim. The Court agrees: the function described in this term is similar to that described in claim 10 (changing the images based on signals received from the microcontroller), but here the term specifically focuses on changes to pixels based on polarity differences. The Court will therefore adopt plaintiff's definition:

> **Fourth means responsive to the signals from the third means for providing for increases in the gray levels of the images in first elements in the display means in accordance with differences of one polarity as represented by the signals from the third means for such first elements and for providing for decreases in the gray levels of the images in second elements in the display means in accordance with differences of an opposite polarity as represented by the signals from the third means for such second elements** describes the following:
>
> Structure: row and column drivers (*see, e.g.,* row and column drivers 24 and 26).
>
> Function: for providing for increases in the gray levels of the images in one group of pixels of the display in accordance with differences of one polarity as represented by the signals from the third means (i.e., programmed microcontroller) for that group of pixels and for providing for decreases in the gray levels of the images in another group of pixels of the display in accordance with differences of an opposite polarity as represented by the signals from the third means (i.e., programmed microcontroller) for that other group of pixels.

///

**United States District Court**
For the Northern District of California

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court adopts the constructions set forth above.

**IT IS SO ORDERED.**

Dated: July 3, 2012

_____
SUSAN ILLSTON
United States District Judge